**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | | |
|---|---|---|
| REXING QUALITY EGGS, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| REMBRANDT ENTERPRISES, INC., | ) | |
| Defendant. | ) | |
| _____ | ) | Case No. 3:17-CV-141-JMS-MPB |
| | ) | |
| REMBRANDT ENTERPRISES, INC., | ) | |
| Counterclaim Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| REXING QUALITY EGGS, JOSEPH L. | ) | |
| REXING, LEO R. REXING and | ) | |
| DYLAN REXING, | ) | |
| Counterclaim Defendants. | ) | |

**REXING QUALITY EGGS, JOSEPH L. REXING, LEO R. REXING, AND DYLAN
REXING'S RESPONSE IN OPPOSITION TO REMBRANDT ENTERPRISES, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i-ii

TABLE OF AUTHORITIES ...................................................................................... iii-iv

INTRODUCTION ......................................................................................................... 1

STATEMENT OF MATERIAL FACTS IN DISPUTE ................................................ 2

    A. Factual Background.......................................................................................... 2

        i. The Parties ............................................................................................. 2
        ii. The Avian Influenza Outbreak and Its Effect ...................................... 3
        iii. Anticipated Cage-Free Demand and Procurement of Egg-Laying Facilities............... 3
        iv. The Tipton, Missouri Farms ................................................................. 4

    B. Facts Concerning the Intent of the Purchase Agreement ................................ 5

        i. Initial Relationship Between Rembrandt and RQE ............................... 5
        ii. Selling the Tipton Supply to RQE ........................................................ 5
        iii. Ramping Up Production at the Tipton Farms ........................................ 6
        iv. Quality Provisions Contained in the Tipton Supply Contracts ............. 7
        v. Negotiation of Terms ............................................................................ 7
        vi. Draft and Final Purchase Agreement ................................................... 8
        vii. The Ramp-Up Period ........................................................................... 10

    C. Facts Concerning Problems with Egg Quality ............................................... 10

        i. Early Problems with Egg Quality ....................................................... 10
        ii. MG Outbreak and Euthanizations at the Tipton, MO Farms ................. 12

    D. Facts Concerning Commercial Impracticability ............................................ 14

    E. Facts Concerning Significant, Unexpected Drop in Consumer Demand.......... 14

        i. Hickman Agreeing to Purchase 11 Loads From RQE .......................... 14
        ii. Continuing Effect of Avian Influenza On Supply ............................... 15
        iii. Significant Lack of Consumer Demand for Cage-Free Shell Eggs ........ 15
        iv. Intent of Section O .............................................................................. 16

    F. Facts Concerning Rembrandt's Damages ...................................................... 17
        i. Extra Loads Requested by RQE .......................................................... 17
        ii. Rembrandt's Euthanization and Restocking of the Tipton Farms ............. 18
        iii. Discussions Concerning Euthanization of All Tipton Supply ................. 19

ARGUMENT ............................................................................................................... 19

I.       STANDARD ................................................................................................... 19

II.      REMBRANDT'S ALLEGED DAMAGES DO NOT RELATE TO THE GOODS "IDENTIFIED" UNDER THE PURCHASE AGREEMENT BUT ARE PURPOSEFULLY INFLATED..... ................................................................................................. 19

    A.  The Resold Goods Are Not the Goods "Identified" In the Purchase Agreement ............ 20

        i.    Goods Identified in the Purchase Agreement ............................................. 20
        ii.   The Resold Goods Are Unrelated ............................................................. 21

    B.  Rembrandt's "Broken" Eggs Were Nonconforming........................................................ 23

    C.  No Notice to RQE ........................................................................................................ 25

III.     REMBRANDT'S PRE-EXISTING BREACH OF THE PURCHASE AGREEMENT AND THE EXPRESS WARRANTIES PROVIDED THEREIN ....................................................... 26

    A.  Terms Expressly Warranted to Rexing Eggs by Rembrandt............................................. 26

        i.    The Quality Specification ......................................................................... 26
        ii.   Location of the Shell Eggs ........................................................................ 27

    B.  Rembrandt's Breach of Contract and Express Warranties................................................ 27

        i.    Rembrandt's Limitation of Remedies Argument........................................ 28

IV.    RQE'S CONTINUED PERFORMANCE WAS "EXCUSED" PURSUANT TO THE PURCHASE AGREEMENT, AND BECAUSE OF COMMERCIAL IMPRACTICABILITY/FRUSTRATION................................................................................... 30

    A.  Section O of the Purchase Agreement............................................................................ 30

    B.  Commercial Impracticability and Frustration ................................................................. 32

V.     RQE IS A PARTNERSHIP; DYLAN REXING CANNOT BE INDIVIDUALLY LIABLE TO REMBRANDT....................................................................................................................... 35

CONCLUSION........................................................................................................................ 35

CERTIFICATE OF SERVICE ............................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*American Soil Processing, Inc. v. Iowa Comp. Petroleum Underground Storage Tank Fund Bd.,*
      586 N.W.2d 325 (Iowa 1998) ................................................................ 32

*Berryhill v. Hatt,*
      428 N.W.2d 647 (Iowa 1988) ................................................................ 31

*Bill's Coal Co., Inc. v. Board of Public Utilities of Springfield, Mo.,*
      887 F.2d 242 (10th Cir. 1989) .............................................................. 22

*C.C. Hauff Hardware, Inc. v. Long Mfg. Co.,*
      148 N.W.2d 425 (Iowa 1967) ................................................................ 29

*DeWaay v. Muhr,*
      160 N.W.2d 454 (Iowa 1968) ................................................................ 24

*Fausel v. JRJ Enters., Inc.,*
      603 N.W.2d 612 (Iowa 1999) ................................................................ 31

*Hearst Corp. v. Cuneo Press, Inc.,*
      291 F.2d 714 (7th Cir. 1961) ................................................................ 19

*Howard v. Schildberg Constr. Co.,*
      528 N.W.2d 550 (Iowa 1995) ................................................................ 31

*Kuehl v. Freeman Bros. Agency, Inc.,*
      521 N.W.2d 714 (Iowa 1994) ................................................................ 25

*Life v. F.C. Tucker Co.,*
      948 N.E.2d 346 (Ind. Ct. App. 2011) .................................................... 35

*Limited Flying Club, Inc. v. Wood,*
      632 F.2d 51 (8th Cir. 1980) .................................................................. 30

*Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,*
      106 F.3d 1388 (7th Cir. 1997) .............................................................. 19

*Mel Frank Tool & Supply, Inc. v. Di-Chem Co.,*
      580 N.W.2d 802 (Iowa 1998) .......................................................... 33, 34

*Molo Oil Co. v. River City Ford Truck Sales, Inc.,*
      578 N.W.2d 222 (Iowa 1998) ................................................................ 26

*Nachazel v. Miraco Mfg.,*
      432 N.W.2d 158 (Iowa 1988) ................................................................ 29

*Nora Springs Co-op. Co. v. Brandau,*
    247 N.W.2d 744 (Iowa 1976) ........................................................................... 32, 33

*Posey v. Skyline Corp.,*
    702 F.2d 102, 105 (7th Cir. 1983) ......................................................................... 19

*Rembrandt Enterprises, Inc. v. Dahmes Stainless, Inc.,*
    2017 WL 3929308 (N.D. Ia.–Western Div. 2017)(Strand, J.) ................................. 34

*R.E.T. Corp. v. Frank Paxton Co.,*
    329 N.W.2d 416 (Iowa 1983) ................................................................................ 25

*R.J. Meyers Co. v. Reinke Mfg. Co., Inc.,*
    885 N.W.2d 429 (Iowa Ct. App. 2016) .................................................................. 26

*Royal Business Machines, Inc. v. Lorraine Corp.,*
    633 F.2d 34 (7th Cir. 1980) .................................................................................. 19

*State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc.,*
    110 N.W.2d 449 (Iowa 1961) ................................................................................ 29

*Village Supply Co. v. Iowa Fund, Inc.,*
    312 N.W.2d 551 (Iowa 1981) ................................................................................ 31

*Walsh v. Nelson,*
    622 N.W.2d 499 (Iowa 2001) ................................................................................ 31

**Rules**
Fed. R. Civ. P. 56(c) ..................................................................................................... 19

**Statutes**
I.C.A. § 554.2101, *et seq.* ........................................................................................... 20
I.C.A. § 554.2104 ........................................................................................................ 20
I.C.A. § 554.2105 ........................................................................................................ 20
I.C.A. § 554.2106 ........................................................................................................ 20
I.C.A. § 554.2201 ........................................................................................................ 20
I.C.A. § 554.2202 ........................................................................................................ 20
I.C.A. § 554.2306 ........................................................................................................ 22
I.C.A. § 554.2313 .................................................................................................... 26, 27
I.C.A. § 554.2501 ........................................................................................................ 20
I.C.A. § 554.2612 .................................................................................................... 22, 28
I.C.A. § 554.2615 ........................................................................................................ 33
I.C.A. § 554.2706 ...................................................................................... 20, 22, 23, 24, 25
I.C.A. § 554.2719 ........................................................................................................ 29

**Other Authorities**
Restatement (Second) of Contracts § 261 (1981) ....................................................... 37

## INTRODUCTION

This case involves the risk of loss between merchants in the consumer-driven egg industry. Rembrandt Enterprises, Inc. ("Rembrandt") agreed to sell and Rexing Quality Eggs ("RQE") agreed to purchase twelve (12) loads of certain quality cage-free specialty eggs produced from a specified location under a one-year contract. Since the avian influenza outbreak in 2015 effecting over 40 million birds including almost all U.S.-based egg producers, the egg market has been plagued by constant price fluctuation, mainly due to an increase in *supply* of eggs as producers restocked their barns with egg-laying birds. Complicating price fluctuation is the push for more humane treatment of egg laying birds. In 2016, restaurant chains and retailers began to aggressively adopt "cage-free" eggs as their standard, which caused producers like Rembrandt to adjust their production practices. The consumer *demand* of this premium product did not keep up with expectations in production.

There are multiple genuine issues of material fact that require determination by jury. First, there is a question of fact as to whether the parties contemplated that a significant and unexpected drop in consumer demand for the cage-free eggs "excused" RQE's continued performance under Section O of the Purchase Agreement. Section O was drafted by Rembrandt and is identical to a provision that Rembrandt used as a result of the avian influenza outbreak in 2015 to excuse its supply obligations to its customers. Second, there are questions of fact as to whether there were pre-existing material breaches of the express warranties provided by Rembrandt to RQE and whether RQE became "commercially frustrated" prior to its rightful repudiation in June of 2017. In its filings, Rembrandt neglects to mention that the outbreak and rampant spread of *Mycoplasma gallisepticum* ("MG") in its birds at the Tipton, Missouri farms caused issues with reduced production and quality of the shell eggs, culminating in the

euthanization of the very supply of eggs that was going to RQE. The parties did not contemplate that the entire risk of loss would solely shift upon RQE irrespective of Rembrandt's obligations. Third, there are questions of fact as to whether Rembrandt's damages are proper under the Uniform Commercial Code (UCC). While Rembrandt is purportedly requesting that the Court enforce the terms of the Purchase Agreement, in reality it is actually proposing a material modification in order to purposely inflate its alleged damages. Fourth, Dylan Rexing is not a partner of RQE and therefore, judgment cannot be rendered against him, individually.

Due to these questions of fact, Rembrandt's motion for summary judgment should be denied, and this case set for trial.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

### A.   Factual Background
#### i.   The Parties

Joseph (Joe) and Leo Rexing have been in the egg industry operating business under the name "Rexing Quality Eggs" for profit in Southern Indiana for over 20 years. (Doc. 89-15 at 2). RQE's profits and losses flow directly to Joe and Leo and are recorded on their individual tax returns. (Doc. 89-12). Dylan Rexing ("Dylan") (Joe's son) is the Vice President of Operations at RQE and does not share in the profits and losses of RQE (Doc. 73 at 4, ln. 8:20-21); (Doc. 89-13).

Rembrandt Enterprises, Inc. ("Rembrandt") is the third largest egg producer in the United States with is principal place of business in Spirit Lake, Iowa. (Doc. 89-3 at 5, ln. 18:15-20). Since 2016, Rembrandt has been "aggressively investing" in its cage-free shell egg business.[1] (Doc. 89-3 at 14-20, ln. 27:22-33:1)(referring to whole eggs as "shell eggs").

---

[1] Rembrandt is predominately in the "egg products" business, selling dried or powdered egg as an additive in customers' products. (*Id.*). Rembrandt also sells eggs on the liquid market,

### ii. *The Avian Influenza Outbreak and Its Effect*

In 2015, a strain of high path avian influenza dubbed "H5N2" swept through Midwestern poultry farms and quickly became the worst outbreak of avian influenza in U.S. history. (*Id.* at 27-28, ln. 40:12-41:7). The outbreak caused the euthanization of approximately 40 million birds. (*Id.*).

### iii. *Anticipated Cage-Free Demand and Procurement of Egg-Laying Facilities*

After the avian influenza hit, there was a "mad rush" for Rembrandt to get egg supply, utilize all of their assets, and keep its people employed. (Doc. 89-5 at 4-5, ln. 6:24-7:16). At that time, Rembrandt began "aggressively investing" in production of "cage-free" shell eggs. (Doc. 89-3 at 14-20, ln. 27:22-33:1). The directive within Rembrandt was to do "whatever we can" to procure more cage-free shell eggs. (Doc. 89-5 at 8, ln. 10:1-22; at 10-12, ln. 12:12-14:19).

Rembrandt anticipated a lot of customer demand for cage-free shell eggs. (*Id.* at 11, ln. 13:19-14:1). Rembrandt anticipated a whole market change, probably the most significant change within the U.S. egg industry Rembrandt has ever seen. (Doc. 89-3 at 19-20, ln. 32:10-33:1). Rembrandt believed it could see a future where 50% of U.S. egg consumption is cage-free in less than 10 years. (*Id.*). Responding to this anticipated demand, Rembrandt needed to "look at opportunities to grow the proportion of [its] cage-free business" to keep "on trend" long term with customer demand. (*Id.* at 15, ln. 28:3-16). Citing to the grocery chain Costco, Rembrandt needed to make some level of commitment to cage-free over some level of timeframe, between the date of 2016 and the date of 2025. (*Id.*). Accordingly, Rembrandt went from zero percent cage-free production to nearly 20 percent in the last 5 years. (Doc. 89-3 at 5-6, ln. 18:21-19:6). Because cage-free facilities differ from conventional egg facilities in a number of different ways,

---

meaning taking an egg, breaking it, and selling it in liquid form. (*Id.*). Rembrandt does not sell conventional "caged" shell eggs. (Doc. 89-4 at 5, ln. 35:20-24).

Rembrandt had to purchase existing cage-free facilities, build cage-free facilities, and contract with cage-free egg farmers. (*Id.* at 6-7, ln. 19:1-20:1; at 16-17, ln. 29:14-30:1). However, Rembrandt did not actually have a lot of customers lined up to purchase cage-free shell eggs. (Doc. 89-5 at 11-12, ln. 13:20-14:7).

### iv.  The Tipton, Missouri Farms

In 2015, Rembrandt employees went to look at egg production facilities located in Tipton, Missouri. (*Id.* at 54, ln. 64:15-20). At that time, the Tipton facilities were not ready for production and had to be brought "on-line" (meaning designed, "stuff being built," and equipped with machinery). (*Id.* at 13-14, ln. 15:9-16:5). On July 9, 2015 and August 31, 2015, Rembrandt entered into Contract Production and Supply Agreements ("Tipton Supply Contracts") with two (2) entities in Tipton named Hentges Egg Farms, LLC ("Hentges") and Ragsdale Egg Production LLC ("Ragsdale"), respectively (together as the "Tipton Farms"). *See* (Doc. 89-2). The Tipton Supply Contracts provided for production of shell eggs, the type of which could be designated by Rembrandt. (*Id.* at 1 and 14). Hentges[2] was capable of housing approximately 360,000 cage-free birds, and Ragsdale[3] was capable of housing 270,000 cage-free birds. (*Id.*). According to Ragsdale, his birds lay approximately one (1) egg per day, so if his birds were laying at 95%, then the birds were going to make 95% of 44,500 eggs per day (*Id.*)(hereinafter, the eggs produced by Hentges and Ragsdale are referred as the "Tipton Supply"). For the Tipton Farms, Rembrandt paid for the birds and the feed, while the Tipton Farms paid for the facilities, the labor, the utilities, and oversight to produce the eggs. (Doc. 89-3 at 7, ln. 20:16-21). Rembrandt

---

[2] For Hentges, the birds would be housed at two separate sites known colloquially as Sunrise and Richland Creek. (Doc. 89-6 at 5-6, ln. 9:20-10:4). The Richland Creek site contained four (4) houses, each housing approximately 45,000 birds, and the Sunrise site contained an additional four (4) houses, each housing approximately 45,000 birds. (*Id.* at ln. 10:8-15); *see also* (*id.* at 31, ln. 51:2-18)(Rembrandt numbered the houses at Sunrise "Hentges House 1 through 4" and at Richland Creek "Hentges House 5 through 8").

[3] Ragsdale housed all its birds at one site.[3] (Doc. 89-7 at 5, ln. 8:3-13).

owned the chickens. (*Id.* at ln. 20:9-11). According to the Tipton Supply Contracts, Rembrandt had "the sole discretion" to determine when to "repopulate" any houses the Tipton Farms. (Doc. 89-2 at 5 ¶ 9 and 18 ¶ 8).

**B.    Facts Concerning the Intent of the Purchase Agreement**
**i.    Initial Relationship Between Rembrandt and RQE**

When Rembrandt was actively looking for egg producers in April or May of 2015, Rembrandt discovered RQE. (Doc. 89-5 at 44, ln. 49:7-22). In mid-2016, they discussed having RQE be "an offline grader and packager of potential cage-free product to supply to Wal-Mart," which Rembrandt labeled "a contract manufacturer."[4] (*Id.*). Graded shell egg was not a focus area for Rembrandt. (Doc. 89-8 at 29). If the Wal-Mart deal came to fruition, RQE planned to use a facility located in Rose Bud, Arkansas (the "Caldwell Facility") owned by Billy Caldwell of Caldwell Foods to grade the eggs, while RQE would transport the eggs. (Doc. 73 at 13-14, ln. 44:7-46:19).

In May and June of 2016, Rembrandt became involved in a dispute with customer Hidden Villa Ranch ("HVR") over an "organic" egg certification issue. (Doc. 89-42); (Doc. 89-43). After HVR notified Rembrandt it was terminating its Supply Agreement with Rembrandt for its failure to meet the "organic" specification, Rembrandt, for an unknown reason, decided to pull its bid to supply eggs to Wal-Mart. (*Id.*); *see also* (Doc. 89-5 at 41-42, ln. 46:25-47:15). Consequently, Rembrandt did not need RQE to be a contract manufacturer for the Wal-Mart shell eggs.

**ii.    Selling the Tipton Supply to RQE**

Instead, Gidley began pursuing Caldwell and RQE to take the Tipton Supply. (Doc. 73 at 13-14, ln. 44:7-46:19). Gidley visited the Caldwell Facility. (*Id.*). Gidley mentioned that

---

[4] A "contract manufacturer" is "a company that takes the shell egg in and then just packages it and then we [Rembrandt] sell it to our customer." (*Id.* at 45-47, ln. 50:23-52:9).

Rembrandt would be interested in selling Caldwell and RQE the Tipton Supply because "we have extra eggs to sell." (*Id.*)  On July 14, 2016, Gidley inquired, "How much could this guy do for us next week? Meaning when could he start and with how much currently and then when could he grow and how much?" (Doc. 89-4 at 22). Gidley's email explicitly provided that RQE is "300 miles south from **Tipton**[.]" (*Id.*)(emphasis added). Ben Sivertson, Rembrandt employee, responded, attaching a document labeled "Egg Farm Grading Summary" with specifics about RQE. (*Id.* at 23-24). Gidley then began contacting Dylan directly, and on July 25, 2016, Gidley emailed Dylan: "Thank you for taking the time to talk to me today. Your Arkansas plant definitely fits our needs for our 1,000,000 **Missouri** birds." (Doc. 89-17)(emphasis added).

### iii.  Ramping Up Production at the Tipton Farms

Because of the time it takes to stock houses with birds and get the eggs to production quality,[5] Gidley understood that the Tipton Supply would not be producing full volume until the very end of 2016 or the beginning of 2017. (Doc. 89-4 at 32-33)(showing the remaining bird stocking dates at Hentges and Ragsdale).[6]  Prior to RQE, there was no consistent buyer for the Tipton Supply, and the eggs were either sold on the breaker market or being sold as "spot loads"[7] going to buyers all over the country. (Doc. 89-7 at 7, ln. 10:14-25; at 9-10, ln. 12:16-13:1); (Doc. 89-6 at 16, ln. 20:6-21). At the end of summer of 2016, Rembrandt told Ragsdale that all the Tipton Supply produced was going to go to RQE. (Doc. 89-7 at 11, ln. 14:9-18). As far as

---

[5] When birds are first placed in barns, they are young and lay a small egg. (Doc. 89-6 at 14, ln. 18:1-20); (Doc. 89-7 at 7, ln. 10:22-25). Before the eggs get up to production weight, the eggs go to a breaker. (Doc. 89-6 at 12, ln. 16:1-25).

[6] Rembrandt started placing birds at Hentges in January of 2016, and the process took approximately nine (9) months for all eight barns to be stocked. (Doc. 89-6 at 15, ln. 19:1-12). Rembrandt started placing birds at Ragsdale in January of 2016, taking between one and three months in between placement per house, with the last house being placed in November or December of 2016. (Doc. 89-7 at 6-7, ln. 9:12-10:9).

[7] "Spot loads" are individual loads priced and sold to buyers. (Doc. 89-3 at 46, ln. 63:21-23).

Hentges could remember, Rexing was the first contract buyer of his supply. The Tipton Supply was first sold under contract to RQE. (Doc. 89-5 at 36, ln. 41:5-16).

### iv.  Quality Provisions Contained in the Tipton Supply Contracts

The Tipton Supply Contracts contained provisions concerning quality of the eggs being produced. (Doc. 89-2 at 1 ¶ 4 and 14 ¶ 4). The Tipton Farms were to meet the Egg Clearinghouse, Inc. ("ECI")'s standard allowances. (*Id*.). If the Tipton Farms did not meet these standard allowances, the producers would be charged back for any deductions on a percentage basis. (*Id*.). Appendix A of the Tipton Supply Contracts provided an example of these allowances and deductions using the ECI standard for "checks"[8] of six percent (6%) if there was an instance involving a quality deduction of 10% for checks. (*Id*. at 8 and 21).

### v.  Negotiation of Terms

More specifically, in early August Rembrandt, Caldwell, and RQE began negotiating the terms of the purchase of the Tipton Supply. *See* (Doc. 89-19). In a chain of emails, Gidley provided terms to Caldwell and RQE: "10-14 loads a week by Jan 15-, Nest run, Picked up in **tipton mo.**, .85/doz…1 yr contract." (*Id*. at 3)(emphasis added). Gidley further pressured Caldwell and RQE stating: "Developing euth plan for some of these birds as we speak- need input soon!! To save them!" (*Id*.) Rembrandt was contemplating euthanizing some or all of the Tipton Supply if Caldwell and RQE did not agree to purchase the eggs. (*Id*.); *see also* (Doc. 89-18). Caldwell then asked Gidley further questions about quality of the eggs. (Doc. 89-19 at 3)("Quality will be very critical."). Gidley responded in red:

> With respect to each load of Shell Eggs, **ninety-one and a half percent (91.5%) of such Shell Eggs shall grade out as Grade A, and specifically, no more than**

---

[8] "Checks" means a little check or a little hole in the egg. (Doc. 89-8 at 5, ln. 36:5-7). According to Ragsdale, a good amount of checks is between three (3) to six (6) percent. (Doc. 89-7 at 19, ln. 22:16-24).

**eight and a half percent (8.5%) of any load of Shell Eggs shall grade out as restricts or losses**.

(*Id*.)(emphasis added)(hereinafter, the "Quality Specification").

On August 11, 2016, Dylan also emailed Gidley, asking him: "I assume FOB means picked up at your farm[?]" (Doc. 72-14). In response to Dylan's question, Gidley stated: "Yes **Tipton mo**." (Doc. 89-20 at 1)(emphasis added). Gidley then emailed Rembrandt employees Moriah Jirik and Hagist: "Just talked to Rexing and they still think they are going to take a big portion or all of the **Tipton supply**, im starting to believe him!!" (Doc. 89-21)(emphasis added). On August 15, 2016, Dylan emailed Gidley attaching a document titled "Intent to Purchase Eggs", containing the material terms of the deal between RQE and Rembrandt. (Doc. 89-4 at 30-31).

### vi.  *Draft and Final Purchase Agreement*

On August 19, 2016, Moriah Jirik of Rembrandt sent Dylan the first draft of the proposed agreement between RQE and Rembrandt. (Doc. 89-22)(hereinafter, the "First Draft"). In response to the First Draft, Dylan sent Jirik a detailed email requesting Jirik make a number of edits in the draft, including:

> Rembrandt is [g]uaranteeing a 91.5% grade out to be able to be **merchantable** basically.  If we come to a part where it gets over that amount or excessive, we want to make sure we are not on the short side of the stick.  By that I mean, we would like to have Rembrandt pick up that product and give credit; and
>
> Need a clause for us[ ] to get out of this contract based on poor performance.

(Doc. 72-10 at 1, #3 and #8)(emphasis added). On August 26, 2016, Jirik sent Dylan an email attaching the second draft of the proposed agreement. (Doc. 89-23)(the "Second Draft"). The Second Draft included one of Dylan's requested changes:

| First Draft Language: | Second Draft Language: |
|---|---|
| "Each load with be inspected for compliance with the following specifications:" | "Each load with be inspected at loading, and all Shell Eggs will be supplied in compliance with the following specifications:" |

(*Id.* at 8). On August 31, 2016, Jirik sent Dylan another email attaching the third draft that included "the first right of refusal language added." (Doc. 72-12)(the "Third Draft"). On August 31, 2016, Dylan responded to Jirik about the Third Draft, again requesting: "[A] clause in the contract for immediate cancelation based on poor egg performance." (Doc. 72-11). On September 2, 2016, Jirik again responded to Dylan indicating she included his requested change, attaching another draft. (Doc. 89-24)(hereinafter, the "Fourth Draft"). In particular, Jirik made the following addition to the Fourth Draft:

| Third Draft Language: | Fourth Draft Language: |
|---|---|
| In the event of any material breach of any of the specifications noted above, Purchaser shall provide immediate notice to Rembrandt and an opportunity to review and confirm the failure. As Purchaser's sole remedy for such non-compliance, Purchaser shall have the right to reject any load in which the parties agree upon such non-compliance. | In the event of any material breach of any of the specifications noted above, Purchaser shall provide immediate notice to Rembrandt and an opportunity to review and confirm the failure. As Purchaser's sole remedy for such non-compliance, Purchaser shall have the right to reject any load in which the parties agree upon such non-compliance, **and Rembrandt shall be responsible in the case of a rejected load, for reimbursing Purchaser its cost incurred for freight to deliver such load to Purchaser's grader, and Rembrandt shall be responsible for the freight to return the shipment to Rembrandt's designated location**. |

(*Id.* at 7)(RQE's "Right to Reject"). On September 2, 2016, Dylan on behalf of RQE signed and executed the Fourth Draft. (Doc. 72-1)(the "Purchase Agreement"). Under the Purchase Agreement, Rembrandt and RQE agreed to the following material terms:

1) Rembrandt was to supply RQE with twelve (12) loads of white, cage-free shell eggs (the "Shell Eggs") from October 3, 2016 to October 3, 2017;

2) that 91.5% of those eggs were to be Grade A (with no more than 8.5% being "restricts" or "losses"; and

3) that the Shell Eggs were to be supplied from the producers located in Tipton, Missouri except during the "Ramp Up Period" where Rembrandt could source eggs from other producers.

(*Id.*); *see also* (Doc. 89-4 at 32-33).

### vii. The Ramp-Up Period

The Ramp Up Period was necessary for Rembrandt, because the Tipton Supply was not fully ready for production. (Doc. 89-4 at 32-33). Under Section B (titled "Volume"), the Purchase Agreement explicitly provided:

[T]he schedule below is a tentative ramp up schedule expected to be in place for deliveries through week December 25 (the "Ramp Up Period,") whereby Rembrandt has the right to source certain loads form other locations, and to supply less than twelve loads per week, **until all loads can be supplied from Tipton, Missouri location**:

| Start Date | Tipton, MO Loads | Loads Other Locations | Total Loads |
|---|---|---|---|
| 10/3/2016 | 6 | | 6 |
| 10/10/2016 | 7 | 1 | 8 |
| 10/17/2016 | 9 | 3 | 12 |
| 10/24/2016 | 10 | 2 | 12 |
| 10/31/2016 | 10 | 2 | 12 |
| 11/7/2016 | 10 | 2 | 12 |
| 11/14/2016 | 10 | 2 | 12 |
| 12/25/2016 | 11 | 1 | 12 |
| 2/12/2017 | 12 | | 12 |

(Doc. 72-1)(emphasis added)(the "Ramp-Up Period").  Thus, the Ramp-Up Period as defined in the Purchase Agreement began on October 3, 2016 and ended on December 25, 2016.

### C.    Facts Concerning Problems with Egg Quality
#### i.   Early Problems with Egg Quality

Rembrandt had extensive quality control standards for its egg products and liquid business but had none for cage-free shell eggs. (Doc. 89-5 at 23, ln. 25:12-18; at 29, ln. 31:23-25). In fact, under the organization structure of Rembrandt, cage-free was specifically outside of quality control, which even Rembrandt employees thought was "weird." (*Id.* at 17, ln. 19:2-11).

At the end of September of 2016, RQE first started receiving loads from Rembrandt. (Doc. 89-10 at 39-47). However, "things could not have gotten off to a worse start with this contract." (Doc. 89-8 at 15-20); *see also* (Doc. 89-5 at 36-37, ln. 41:24-42:1)(stating "I heard that during the start-up over the first two to four weeks was just terrible"); (*Id.* at 38, ln. 43:2-4)(stating "everything from the start with Tipton got off on the wrong foot."). Upon delivery of the first load of the Tipton Supply, the USDA sampled the load and determined the load needed to be rejected. (Doc. 89-8 at 15-20). In October and November of 2016, Dylan notified Rembrandt continuously about having "quality" issues with the eggs, chief among the issues were "checks" and "dirts."[9] (Doc. 89-10 ¶¶ 42-48); *see also* (Doc. 89-8 at 21-28). On November 14, 2016, Pohlman emailed Wayne Hentges that Rembrandt was going to start charging Hentges for not meeting the specifications under the Tipton Supply Contracts. *See* (Doc. 89-44). Around this time, Dylan, on behalf of RQE, visited the Tipton Farms himself. (Doc. 73 at 41, ln. 154:3-6). After asking Rembrandt if they had any records of quality inspections, Rembrandt told Dylan they had none available. (Doc. 89-10 ¶ 45).

At the end of October, Rembrandt sent employee Dion Scott out to the Tipton Farms to determine the problems. *See* (Doc. 89-6 at 37-38). Scott reported, "I believe there [are] two main issues causing the higher amounts of checks; shell quality and equipment." (*Id.*). Scott recommended Rembrandt and the Tipton producers make necessary adjustments. (*Id.*). At Hentges, Rembrandt started "running vitamins to the birds" to help shell quality and adjusted the equipment. (*Id.* at 23-24, ln. 32:14-33:7). At Ragsdale, Rembrandt made "a lot of adjustments" to address a "combination of things." (Doc. 89-7 at 15-17, ln. 18:21-20:15). The changes made some improvement as shown by the grade-outs, but the check issue continued. (*Id.* at 18, ln. 21:5-14); (Doc. 89-10 at 39-47). On November 25, 2016, Dylan emailed Rembrandt: "Our

---

[9] "Dirts" means dirty eggs.

contract calls for 91.5 quality which we are running 81.64-82.64. This is 8.86-9.86 off of our numbers." (*Id.* ¶ 47).

### ii.   MG Outbreak and Euthanizations at the Tipton, MO Farms

In January of 2017, an internal email of Rembrandt shows that there was an investigation performed by John Schleifer, Rembrandt's Staff Veterinarian, of an outbreak of MG in the Tipton, MO area. *See* (Doc. 89-26). In his email, Schleifer explicitly requested that: "Please advise Rexing of the unsanitary condition of flats being returned to our contract farms. These unsanitary conditions can contribute to disease spread." (*Id.* at 4). Rembrandt did not inform RQE of the presence or spread of MG. (Doc. 89-10 ¶ 56). On March 8, 2017, Schleifer advised Hentges that "[t]here is likely something going on with the birds" at Hentges House 4 (Sunrise). (Doc. 89-45 at 2). According to "grade-out reports" created by Caldwell, the quality of the egg loads received by RQE became exceedingly worse in April through June of 2017. (Doc. 89-10 at 39-47). In early April of 2017, Rembrandt began euthanizing its birds at Hentges. (Doc. 89-27); (Doc. 89-28). On or about April 11, 2017, Hentges Houses 6 and 7 tested positive for MG, and Ragsdale Houses 1, 2, 3, and 6 tested positive for MG. (Doc. 89-46). Likely due to the euthanizations at Hentges, Rembrandt began supplying RQE egg loads from sources other than the Tipton Farms in April of 2017. (Doc. 89-29); *see also* Doc. 78-6 at 6-8.

On April 4, 2017, Pohlman emailed Gidley that "I show 163 loads, a deduction has been given for 69 of them. When I average the chex/loss for ALL loads, I get 8.55%"). *See* (Doc. 89-4 at 34). Gidley responded to Pohlman that "they do have a valid point and stage 1 has known about this for quite some time. It does neither of us any good to have excessive checks." (*Id.*). On May 4, 2017, Pohlman emailed Chad Ragsdale informing him that Rembrandt was going to charge Ragsdale for not meeting the specifications under the Tipton Supply Contracts. (Doc. 89-

30). On May 10, 2017, Pohlman emailed Chad Ragsdale informing him that "[w]e won't have long before Rexing begins rejecting those loads and if that happens we won't be paying for them." (Doc. 89-31).

On May 20, 2017, Dylan emailed Pohlman that, "I'm [sic] not taking full volume because **<u>quality is lacking and eggs are small at other farms</u>**. As we change flocks, I don't have enough material to spread across 6 sites it's [sic] just impossible." (Doc. 89-32)(emphasis added). On May 24, 2017, Rembrandt created a document titled "Specialty Egg Quality Timeline" relating to the problems RQE was having with the Shell Eggs. *See* (Doc. 89-33). That document shows that Rembrandt at that time finally started to implement quality control measures relating to cage-free shell eggs. (*Id*.). For the loads that RQE received from Rembrandt in late May and early June, the grade-out reports were trending around 30% under-grade, meaning RQE was receiving only approximately 70% Grade A eggs per load instead of the required 91.5%. (Doc. 89-10 at 39-47). Nevertheless, on June 2, 2017, Gidley spoke with Dylan in a phone conversation and told him, "Rexing does not have the right to reject loads." (*Id.* ¶¶ 58-59)(Doc. 89-34).

Around this time, Rembrandt made the decision to euthanize the Richland Creek site at Hentges, which was depopulated in its entirety beginning July 10, 2017. (Doc. 89-49). In July of 2017, Rembrandt made the decision to start depopulating the barns at Ragsdale. (Doc. 89-47). On or about August 9, 2017, Ragsdale House 1 was depopulated. (Doc. 89-48). The remaining houses at the Ragsdale layer operation were depopulated beginning September 19, 2017. (Doc. 89-49). According to internal Rembrandt emails, these depopulations were a result of MG. *See* (Doc. 89-35 at 2)(stating, "we have less supply due to the MG Depop.").

**D.      Facts Concerning Commercial Impracticability.**

On various dates from November 2016 through March 2017, RQE provided notice to Rembrandt about losing money in transporting, grading, being unable to sell the nonconforming eggs, even with the credits provided by Rembrandt. (Doc. 89-10 ¶¶ 47-51). Upon entering into the Purchase Agreement, RQE had contemplated that the average grade-out loss during the contract term would be somewhere between 0% and the 8.5% Quality Specification, and RQE had prefigured its net profit and profit margin based upon this understanding. (*Id.* ¶ 40-41). Between RQE's purchase for $0.85 per dozen and the sale for $1.20 per dozen (including its costs and expenses in transport, grading, and facilities upgrades), RQE anticipated a profit margin of $0.027845. (*Id.*).

In considering all loads received from Rembrandt during the Purchase Agreement, the average grade-out loss on egg loads was over 10% per load, with the grade-outs becoming exceedingly worse in April, May, and June of 2017. (*Id.* at 39-47). The difference between Rembrandt's grade-out credits provided by Rembrandt and RQE's anticipated profit was $67,261.50. (Doc. 72-6 at 1-9).  Gidley knew of RQE's profit margin, and when the time came to contemplate renewal of RQE's contract beyond the initial one-year term, Gidley advised that RQE "would not have a margin enough to give Rembrandt more money for a renewal on this contract." (Doc. 89-4 at 18, ln. 80:17-24).

**E.      Facts Concerning Significant, Unexpected Drop in Consumer Demand**
**        i.   *Hickman Agreeing to Purchase 11 Loads From RQE***

After signing the letter of intent with Rembrandt, RQE began negotiating with Glenn Hickman of Hickman's Egg Ranch ("Hickman") for purchase of the Tipton Supply after RQE's transport and Caldwell's grading. On August 27, 2016, RQE and Hickman signed the "Intent to Purchase Eggs" whereby Hickman would purchase at least 11 egg loads from RQE for

$1.20/dozen for one (1) year. At the time of signing the Intent to Purchase Eggs, Hickman believed there was a demand for cage-free eggs being "more and more on a wide-scale basis by major retailers and institutional customers." (Doc. 72-4 at 3). Hickman had a relationship with Costco who was "on record publicly as being very aggressive in their adoption of cage-free standards for their stores." (*Id.* at 4). Hickman anticipated and believed that it would be able to purchase the eleven (11) egg loads from RQE for a year. (*Id.* at 16).

### ii.   *Continuing Effect of Avian Influenza On Supply*

In January of 2017, demand for eggs was down as a consequence of the avian influenza outbreak. (Doc. 89-3 at 60-61). The outbreak had reduced the availability of eggs, so as producers began the process of restocking, the producers further increased the supply as compared to demand, causing egg prices to decline to record lows. (*Id.*); *see also* (*Id.* at 38-39, ln. 54:21-55:7). Repopulation of the barns Rembrandt euthanized as a result of the avian influenza was not completed until the end of 2017. (Doc. 89-16).

### iii.   *Significant Lack of Consumer Demand for Cage-Free Shell Eggs*

Because of the decline in egg prices, there was a significant lack of consumer demand for cage-free shell eggs beginning in May and June of 2017. (Doc. 89-3 at 53, ln. 72:7-16)(admitting that cage-free egg prices "were probably lower than historical averages."). In late March and early April 2017, Rembrandt priced selling the Tipton Supply to another buyer named Rose Acres for $0.95 to $1.05 per dozen, but by June 1, 2017 Rose Acres had "bailed" on Rembrandt.[10]   *See* (Doc. 89-4 at 34); *see also* (Doc. 89-41). In addition, Rembrandt's records show that by June 13, 2017 buyers were not interested in cage-free nest runs even for the low

---

[10] The Purchase Agreement provides RQE the "first right of refusal," whereby Rembrandt was free to sell the Tipton Supply to other buyers if it received a better offer.

price of $0.55 per dozen. *See* (Doc. 89-41 at 5)("That price is pretty high for CF Nest Run. I will have to pass on that one.").

Hickman did not anticipate there would be such a change in the demand for commercial cage-free eggs. (Doc. 72-4 at 7, ln. 23:11-16). Hickman was surprised that "consumers that [went] to the grocery stores were not buying the cage-free eggs with as much regularity as they had prior to the spring of 2016." (*Id*.).  Hickman believed it was a pretty abrupt change. (*Id*.). In or about early June of 2017, Hickman started issuing less purchase orders than the agreed-upon eleven (11) loads from RQE, telling RQE and Caldwell that it was "having a tough time figuring out how to get the end customer to continue to buy the darn things." (Doc. 89-9 at 3). When Hickman informed RQE it would stop taking loads, Dylan, on behalf of RQE immediately called everyone he knew in the egg industry to see if they would take the loads. (Doc. 89-14 at 2). Unfortunately, at the time no one wanted cage-free shell eggs. (*Id*.).

As a result, RQE had no choice but to inform Rembrandt it was taking less egg loads. *See* (Doc. 72-21). Thereafter, in a letter from RQE's counsel dated June 8, 2017 to Rembrandt's counsel Sheila B. Hagen, RQE informed Rembrandt it was not able to take delivery of any loads as contemplated by the Purchase Agreement. (Doc. 72-25). That letter cited to quality issues with the Shell Eggs as well as to "excused performance" under Section O of the Purchase Agreement. (*Id*.).

### iv.  Intent of Section O

Section O as written in Rembrandt's First Draft of the Purchase Agreement remained unchanged in all subsequent drafts. *See* (Doc. 89-22 at 4); (Doc. 89-23 at 6); (Doc. 72-12 at 5); (Doc. 89-24 at 5). Section O explicitly provided:

> Any delay or failure of either party to perform its obligations under this
> Agreement shall be excused if, and to the extent that the delay or failure is caused

16

or materially contributed to by force majeure **or other acts or events beyond the reasonable control of a party hereto**. During the period of the delay or failure to perform by Rembrandt, the Purchaser may, at its option, purchase Shell Eggs from other sources.

(Doc. 72-1 at 3)(emphasis added)(hereinafter "Section O").

As a result of the avian influenza outbreak in 2015, Rembrandt was unable to meet supply obligations with its customers and declared force majeure with **all** of its customers. (Doc. 89-3 at 30, ln. 43:23-24)(stating, "I'm not aware of any customer we did not declare force majeure with."). Rembrandt sent letters declaring force majeure to approximately 150 to 250 customers. (*Id.* at 31, ln. 44:11-14). This included sending a letter to customer named Continental Mills on May 8, 2015, enforcing a provision in its Supply Agreement it entered into with Continental Mills. (*Id.* at 57-59; at 30, ln. 43:3-11). In that letter, Rembrandt stated: "Rembrandt's ability to **supply** product under the Supply Agreement we have with you will be impacted…Rembrandt has no choice but to declare a Force Majeure event, effective immediately, pursuant to Section O of our Supply Agreement dated January 1, 2015 **excusing Rembrandt's performance** under the Supply Agreement." (*Id.* at 58)(emphasis added). Section O of Rembrandt's Supply Agreement with Continental Mills is identical to Section O of the Purchase Agreement here. (Doc. 89-36).

> ### F. Facts Concerning Rembrandt's Damages
> #### i. *Extra Loads Requested by RQE*

Each and every week during the term of the Purchase Agreement, Rembrandt sent both RQE and the Tipton Farms a "load schedule" indicating where and when egg loads would be picked up. *See*, *for example*, Doc. 78-2 at 3; (Doc. 89-6 at 35-36; 17, ln. 21:9-25), (Doc. 89-7 at 11-12, ln. 14:19-15:13). At various times during the term of the Purchase Agreement, RQE requested more Shell Eggs from Rembrandt than the allotted twelve (12) loads under the

Purchase Agreement. *See* (Doc. 89-10 ¶ 36). In late December and early January, RQE started purchasing thirteen (13) egg loads per week on a typical basis. (Doc. 73 at 15); *see also* Doc. 78-2 at 2 (stating, "I really need the extra two loads"). These extra loads were added to the weekly load schedule and sold to RQE as "spot" loads. (Doc. 89-10 ¶ 38). Because the Tipton Supply did not have the ability to produce the extra quantity each and every week, a few of the spot loads were sourced from other Rembrandt producers. (*Id.*); *see also* (Doc. 89-37)(stating, "I think we can add another load out of Indiana and be at 13 but I need to talk with them first and I didn't get ahold of them. On a positive note, the week of the 23rd it appears that we will be able to do 13 'normal' load out of Tipton.").

### ii. Rembrandt's Euthanization and Restocking of the Tipton Farms

As stated, Rembrandt euthanized various barns at the Tipton Farms as a result of the MG outbreak in April 2017. Likely due to these euthanizations, Rembrandt began supplying RQE eggs from sources other than the Tipton Supply in April of 2017. (Doc. 89-29); *see also* (Doc. 78-6 at 6-8). Upon receiving a load schedule containing a load from an egg producer in Minnesota, Dylan immediately interjected emailing Rembrandt on April 25, 2017 asking, "Why are we moving a load from MN? Quality isn't as good out of Tipton?" (*Id.*).

After Richland Creek was depopulated, a document produced by Rembrandt shows that the Tipton Farms were not even producing (12) loads beginning the week of July 9, 2017. *See* (Doc. 89-38). The Tipton Farms' ability to supply loads was further reduced in subsequent weeks. (*Id.*). Documents produced by Rembrandt evidence that at least some of the Tipton Farms' barns were not restocked during the term of the Purchase Agreement. (*Id.*); (Doc. 89-39). In addition, for the barns that were restocked, documents show the eggs were not "ready to

candle" (meaning sample), which indicates that the eggs were not ready for production. (Doc. 89-39).

### iii. *Discussions Concerning Euthanization of All Tipton Supply*

Finally, internal Rembrandt emails show that Rembrandt contemplated euthanization of all the Tipton Supply in late June of 2017 after RQE stopped purchasing loads, although it is unclear based on the evidence what decision was made about the Tipton Supply. (Doc. 89-40).

## ARGUMENT

### I.   STANDARD

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To create a question of fact, adverse party responding to properly made and supported summary judgment motion must set forth specific facts showing that there is a genuine issue for trial. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983). Whenever the evidence as to the intent of the parties in entering into an agreement in which their intent is not spelled out is conflicting, the issue as to their intent is a question of fact. *Hearst Corp. v. Cuneo Press, Inc.*, 291 F.2d 714, 720 (7th Cir. 1961). Further, "[w]hether a seller affirmed a fact or made a promise amounting to a warranty is a question of fact reserved for the trier of fact." *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34, 43 (7th Cir. 1980). Finally, the "ascertainment and assessment of damages is a question of fact for the jury." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d 1388, 1398 (7th Cir. 1997).

### II.   REMBRANDT'S ALLEGED DAMAGES DO NOT RELATE TO THE GOODS "IDENTIFIED" UNDER THE PURCHASE AGREEMENT BUT ARE PURPOSEFULLY INFLATED.

Article 2, titled "Sales", of the Uniform Commercial Code (UCC), and specifically Iowa's version (codified at I.C.A. §554.2101, *et seq*.), applies to the dispute herein.[11] For its damages remedy, Rembrandt relies upon I.C.A. § 554.2706(1) as its elected remedy. § 554.2706(1) provides that:

> [A] seller may resell the goods concerned … [w]here the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages.

Rembrandt claims out-of-pocket damages against RQE totaling $1,665,463.38, representing "the price of the eggs under the Agreement, less the resale price, plus (where applicable) the cost incurred by Rembrandt for shipping the loads to the buyers" for 198 egg loads. (Doc. 78 at 4:15); (Doc. 72-5). Even if assuming that RQE wrongfully repudiated and Rembrandt is entitled to damages, there are genuine questions of material fact concerning Rembrandt's claimed damages.

A.   **The Resold Goods Are Not the Goods "Identified" In the Purchase Agreement**
   i.   *Goods Identified in the Purchase Agreement*

Initially, Rembrandt claims damages relating to the resale of goods that are unrelated to the goods "identified" under the Purchase Agreement. "[G]oods" means all things (including specially manufactured goods) which are movable at the time of **identification** to the contract for sale. I.C.A. § 554.2105(1)(emphasis added). "Goods … are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract. I.C.A. § 554.2106(2). Pursuant to I.C.A. § 554.2501, "[t]he buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract

---

[11] The Purchase Agreement is an agreement between merchants pursuant to I.C.A. § 554.2104 meeting the formal requirements of a contract pursuant to I.C.A. § 554.2201 involving a "transaction in goods" pursuant to I.C.A. § 554.2202. (Doc. 72-1). The Purchase Agreement contains a "Governing Law" provision in favor of Iowa law. (*Id*. at 3).

refers even though the goods so identified are nonconforming and the buyer has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties."

Here, the Purchase Agreement explicitly identified the goods in Section A as "**Product:** White Nest Run Shell Eggs (the "Shell Eggs") meeting the requirements contained on Exhibit A, attached hereto." (Doc. 72-1 at 1). Section B then further provided that the "volume" of the goods were to be "twelve (12) loads of Shell Eggs per week" with a load comprising of "no less than 25 pallets…with approximately 900 dozen Shell Eggs per pallet." (*Id*.). Finally, Section B required that after the Ramp-Up Period "all loads" were to come from the Tipton Farms. (*Id*.).

### ii. The Resold Goods Are Unrelated

First, Rembrandt's damages are unrelated, because only 130 of the egg loads that Rembrandt claims as damages came from the Tipton Farms. (Doc 72-5). RQE has hired a damages expert, James D. Woods, to review Rembrandt's alleged damages contained in Doc. 72-5. According to Woods, many of the shipments contained in Doc. 72-5 did not originate from the Tipton Farms. (Doc. 89-11 ¶ 18). Because the goods resold by Rembrandt were after the Ramp Up Period, which ended on December 25, 2016, the goods as "identified" were to come from the Tipton Farms. In addition to the Purchase Agreement's explicit terms, extrinsic and testimonial evidence supports that the goods were to come from the Tipton Farms.[12] Moreover, the parties' course of dealing supports that the goods were the Tipton Supply. From the end of September 2016 to June of 2017, RQE purchased 343 egg loads from Rembrandt, and 326 came from the Tipton Farms. (Doc. 89-10 ¶¶ 61-62).

---

[12] (Doc. 89-17)("Your Arkansas plant definitely fits our needs for our 1,000,000 Missouri birds."); (Doc. 89-4 at 27)("Picked up in tipton mo.")(Doc. 89-20 at 1)("Yes Tipton mo."); (Doc. 89-7 at 11, ln. 14:9-18); (Doc. 89-5 at 36, ln. 41:5-16); (Doc. 89-5 at 36, ln. 41:5-16).

For the non-Tipton Farms resale loads, Rembrandt argues that because RQE took 17 non-Tipton Farm loads during the terms of the Purchase Agreement, then RQE is then stuck with paying for whatever loads Rembrandt had available after RQE's alleged repudiation. However, Rembrandt's bait-and-switch fails as a matter of law. In this case, Rembrandt is not purporting to be a "lost volume" seller. *See Bill's Coal Co., Inc. v. Board of Public Utilities of Springfield, Mo.*, 887 F.2d 242, 245 (10th Cir. 1989)("A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity."). The Purchase Agreement is not an "output" or "requirements" contract under I.C.A. § 554.2306, which may have required that RQE take all loads available.[13] Rembrandt considers the Purchase Agreement to simply be a "customer contract," because the Purchase Agreement specifies the terms of the agreement between the parties. (Doc. 89-3 at 13-14, ln. 26:20-27:2). Rembrandt's damages cut the requirements of I.C.A. § 554.2706(1), because the 71 loads non-Tipton Farms loads have no relation to the identified goods contained in the Purchase Agreement.

Rembrandt is requesting a material modification of the Purchase Agreement in derogation of Section P of the Purchase Agreement. *See* (Doc. 72-1 at 4)(material modifications must be in writing and executed). Of the 17 non-Tipton Farm loads RQE received, at least 9 were "extra" loads purchased in excess of the Purchase Agreement's 12 load requirement. (Doc. 89-10 ¶ 63). The other 8 non-Tipton loads were only supplied to RQE after Hentges House 4 was euthanized in April of 2017 (which suggests the Tipton Supply was reduced at that time). At no time did RQE agree in writing to modify the terms of the Purchase Agreement so that Rembrandt could haphazardly supply egg loads to RQE from producers all over the county. For the 17 non-Tipton Farm loads received from Rembrandt, RQE received a weekly load schedule showing

---

[13] The Purchase Agreement is likely an "installment contract" pursuant to I.C.A. § 554.2612.

where and when those loads were to be picked up. (Doc. 89-10 ¶¶ 34-35, 54). While RQE requested 8 "extra" loads during the term of the Purchase Agreement, RQE explicitly objected to Rembrandt's production of eggs from other locations in April and May of 2017. (Doc. 89-29); (Doc. 89-32). Receiving and transporting eggs from all these locations would have been "impossible." (Doc. 89-32). Rembrandt's allegations are not "damages" stemming from the Purchase Agreement, but a modification of the terms.

Second, Rembrandt's damage calculations as contained in Doc. 72-5 relate to the resale of too many eggs. Because a "load" was defined as 25 pallets consisting of approximately 900 dozen, the total amount of eggs per load equates to approximately 22,500 dozen. (Doc. 72-1 at 1). According to Woods, each of the 201 loads in Doc. 72-5 contains approximately 24,400 dozen, not 22,500 dozen. (Doc. 89-11 ¶ 20). Therefore, Rembrandt overstates both the amount of eggs RQE was required to take as well as the amount of eggs resold to third-party buyers.

Third, Rembrandt's damage calculations as contained in Doc. 72-5 shows the resale of more than 12 loads in a given week. (*Id.* ¶¶ 21-22). According to Woods, this causes Rembrandt's damages to be inflated. (*Id.*). If Rembrandt is relying upon I.C.A. § 554.2706(1) as its remedy, Rembrandt cannot resell more of the "identified" goods in a given week then RQE would be liable for.

### B.    Rembrandt's "Broken" Eggs Were Nonconforming

In addition, Rembrandt makes no showing that the "goods" were conforming. Rembrandt claims that for 65 of the 198 loads "Rembrandt itself used the eggs by breaking them and processing them into liquid and powdered egg products." (Doc. 78 at 5:18). For these loads, Rembrandt argues that: "[t]he prices of the eggs charged to the Rexings for these 65 loads were the actual prices at which Rembrandt was able to sell loads to third parties at the same time. (*Id.*).

First, this type of calculation is not provided in I.C.A. § 554.2706(1), because Rembrandt is valuing damages against RQE based upon unrelated egg loads sold to unrelated third-party buyers. Second, because Rembrandt used the eggs themselves, Rembrandt received value by not having to purchase other eggs and by being able to sell its "liquid and powdered egg products" to its customers. When peeling back the layers, the Tipton Supply was euthanized on various dates from April to September of 2017 and some of the eggs produced by the Tipton Farms after those euthanization were likely not production quality. *See* F.N. 5, *supra*. More specifically, Rembrandt only used these eggs itself by breaking them, because they had no option to sell these eggs as shell-eggs to third-party buyers. Under the Purchase Agreement, the eggs sold to RQE were to be "91.5% Grade A" with "no more than eight and a half percent (8.5%)…grad[ing] out as restricts or losses." (Doc. 72-1). Rembrandt makes no showing that the 65 loads it used itself were conforming loads that RQE actually would have been able to purchase.

Third, some of the 65 loads relate to eggs produced at the Tipton Farms after the barns were "restocked" with birds after the euthanizations that occurred in April through September of 2017. *See* (Doc. 89-38). While Rembrandt alleges that it "calibrates its supply chain based on the supply contracts it has entered," the facts show that Rembrandt knew that RQE was not taking any more loads and still restocked its hens. (Doc. 78 at 5-6)(Doc. 89-11 ¶ 19). Instead of "calibrating" accordingly, Rembrandt purposefully restocked its barns to increase the Tipton Supply, thereby increasing its damages. RQE cannot be liable for Rembrandt's post-repudiation decision to increase its loss.

Moreover, to the extent common law jurisprudence applies, Rembrandt's damages fail common law rules for mitigating damages under breach of contract theory. Under Iowa law, "[a] person asserting breach of contract has a duty to mitigate the damages. *See DeWaay v. Muhr*,

160 N.W.2d 454, 457 (Iowa 1968). This duty imposes on the complaining party the obligation to exercise all reasonable diligence to lessen the damages caused by the other party's breach. *R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 418–19 (Iowa 1983). Here, Rembrandt's damages were not "foreseeable" at the time RQE entered into the Purchase Agreement. *See Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994)("[D]amages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement…Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded."). RQE would not have contemplated being liable to Rembrandt for non-Tipton Farms loads under the Purchase Agreement. Moreover, Rembrandt's damages are not "traceable" to RQE's alleged failure to perform its obligations under the Purchase Agreement, because it is likely that a majority of non-Tipton Farms loads were already loads not under a contract for purchase. Thus, Rembrandt would have sold those eggs as "spot loads" regardless of RQE's repudiation.

### C.     No Notice to RQE

Finally, Rembrandt did not provide notice to RQE of any of the 198 resale loads, which were resold through private sales. Pursuant to I.C.A. § 554.2706(3), "[w]here the resale is at private sale the seller must give the buyer reasonable notification of the seller's intention to resell." Because of Rembrandt's failure to notify, RQE did not know to whom the goods were being sold, at what price the goods were being sold, and whether the monies were actually paid to Rembrandt. Thus, Rembrandt did not fulfill the requirements of I.C.A. § 554.2706.

Rembrandt is not entitled to summary judgment on its damages because numerous genuine material questions of fact exist. While RQE's damage expert Woods can refute

Rembrandt's damages, Rembrandt bears the burden of proving its entitlement to damages on summary judgment. Rembrandt fails to adequately support its damages.

## III.   REMBRANDT'S   PRE-EXISTING   BREACH   OF   THE   PURCHASE AGREEMENT AND THE EXPRESS WARRANTIES PROVIDED THEREIN.

As stated in Rembrandt's brief, to prevail on its breach of contract claim Rembrandt must prove amongst other things, "that it has performed all the terms and conditions required under the contract." (Doc. 81 at 21)(quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). However, previous to RQE's alleged repudiation, there is a question of fact as to whether Rembrandt was in material breach of the Purchase Agreement and the express warranties provided therein.

Under the UCC, an express warranty is created by:

(a)   Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b)   Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)   Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See* I.C.A. § 554.2313; *see also R.J. Meyers Co. v. Reinke Mfg. Co., Inc.*, 885 N.W.2d 429 (Iowa Ct. App. 2016).

### A.   Terms Expressly Warranted to Rexing Eggs by Rembrandt
#### i.   The Quality Specification

First, Rembrandt warranted in the Purchase Agreement that the Shell Eggs would be "91.5% Grade A" with "no more than eight and a half percent (8.5%)…grad[ing] out as restricts or losses." (Doc. 72-1) According to Rembrandt, not all contracts specify a percentage for

grading the shell eggs, but that each contract is different. (Doc. 89-8 at 6-7, ln. 37:23-38:3). In reviewing the evidence, the parties understood the Quality Specification was a material term required in order for the Shell Eggs to be "merchantable." (Doc. 72-10). Initially, Gidley made the Quality Specification representation to Caldwell. (Doc. 89-4 at 26). After Gidley's representation, the Intent to Purchase Eggs dated August 15, 2016 also contained, "Quality: No more than 8.5% Undergrades/Chex." (Doc. 89-4 at 30). In addition, after sending Dylan the First Draft containing the Quality Specification, Jirik added language to the Second Draft mandating that: "all Shell Eggs **will** be supplied in compliance with the following specifications." *See* (Doc. 89-23 at 8)(emphasis added). Jirik's change remained in the final Purchase Agreement. (Doc. 72-1 at 5). Thus, the Quality Specification was an express warranty under I.C.A. § 554.2313.

### ii. *Location of the Shell Eggs*

Second, Rembrandt warranted that the Shell Eggs were to be produced from the Tipton Farms. *See*, Table, *supra*. (Doc. 72-1 at 1). Due to shipping and packaging concerns, the location of the Shell Eggs was a crucial representation relied upon by RQE when entering into the Purchase Agreement. (Doc. 89-10 ¶ 33). Thus, the eggs' location was an express warranty under I.C.A. § 554.2313.

### B.    **Rembrandt's Breach of Contract and Express Warranties**

Rembrandt materially breached the Purchase Agreement by failing to meet the Quality Specification. *See* (*Id.* at 39-47). In considering all loads received from Rembrandt during the Purchase Agreement, the average grade-out loss on egg loads was over 10% per load, exceeding the 8.5% Quality Specification (with the grade-outs becoming exceedingly worse in April, May, and June of 2017). (*Id.*). Rembrandt understood that the average load exceeded the 8.5% Quality Specification. *See* (Doc. 89-25). In addition, likely due to the euthanization of Hentges House 4

in April of 2017, Rembrandt breached the Purchase Agreement by failing to have sufficient egg loads available from the Tipton Farms.

### i.   *Rembrandt's Limitation of Remedies Argument*

Seemingly admitting that Rembrandt failed to meet the Quality Specification, Rembrandt argues that the grade-out credits provided to RQE were RQE's "exclusive remedy," and that RQE is foreclosed from pursuing damages against Rembrandt. (Doc. 81 at 26-28).  Rembrandt's argument misses the mark for two (2) important reasons. First, under the Purchase Agreement RQE retained the right to reject nonconforming egg loads. Exhibit A of the Purchase Agreement contained the explicit Right to Reject for RQE "[i]n the event of any material breach of any of the specifications noted above." (Doc. 72-1 at 6). Because RQE retained the Right to Reject under the Purchase Agreement, RQE retained its UCC remedies for "rejection" in circumstances involving breach of contract or express warranty. (*Id.*). In particular, RQE retained its right to claim breach of the Purchase Agreement pursuant to I.C.A. § 554.2612 and to reject "any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents." *Quoting* I.C.A. § 554.2612(2).[14] Further, "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." *Id.* at § (3).

Here, upon considering that the majority of egg loads did not meet the Quality Specification and that RQE was losing money, it was reasonable for RQE to anticipate that further loads produced by Rembrandt would also not meet the Quality Specification.

---

[14] Under Subsection (2), the UCC Comment provides that "an installment agreement may require accurate conformity in **quality** as a condition to the right to acceptance if the need for such conformity is made clear either by express provision or by the circumstances." (Emphasis added).

Rembrandt's emails show it was worried that RQE was going to start rejecting egg loads due to not meeting the Quality Specification. (Doc. 89-31); (Doc. 89-33). After Dylan suggested that RQE was able to reject loads, Rembrandt erroneously told Dylan that RQE did not have that right. *See* (Doc. 89-34)(Doc. 89-10 ¶ 59). Nevertheless, Rembrandt was on notice of its continuous breach of the Purchase Agreement for not meeting the Quality Specification, through the grade-out reports and various emails sent by Dylan. Because RQE retained the right to reject, Rembrandt's limitation of remedies argument fails.

Second, limiting RQE to the grade-out credits would "fail the essential purpose" of the express warranties pursuant to I.C.A. § 554.2719(2). RQE contracted for receiving eggs that met the Quality Specification and that were produced by the Tipton Farms. Rembrandt's supply of, at times, Shell Eggs that were only 70% Grade A fails the essential purpose of the 91.5% Grade A requirement in the Purchase Agreement. Further, Rembrandt's supply of eggs from locations other than the Tipton Farms amounts to a material modification not agreed to by RQE. Although Rembrandt provided RQE grade-out credits, these credits do nothing for RQE's reliance on Rembrandt's material representations when entering the Purchase Agreement. In particular, RQE incurred substantial upfront costs in preparation for its obligations under the Purchase Agreement.[15] (Doc. 89-10 ¶¶ 26-29). Thus, the grade-out remedy fails to compensate RQE in any way for Rembrandt's pre-existing breach of the Purchase Agreement. Rembrandt's limitation of remedies argument must fail.

Along these same lines, Rembrandt also attempted to contract-out its express warranties by a disclaimer contained in Section I of the Purchase Agreement. However, the disclaimer is invalid because it would "frustrate the purpose" of the Purchase Agreement. *See State Farm Mut.*

---

[15] "Expenditures in preparation" of the contract are recoverable under Iowa law, through a reliance theory of damages. *See Nachazel v. Miraco Mfg.*, 432 N.W.2d 158, 159-165 (Iowa 1988); *see also C.C. Hauff Hardware, Inc. v. Long Mfg. Co.*, 148 N.W.2d 425, 428 (Iowa 1967).

*Auto. Ins. Co. v. Anderson-Weber, Inc.*, 110 N.W.2d 449, 455 (Iowa 1961); *see also Limited Flying Club, Inc. v. Wood*, 632 F.2d 51 (8th Cir. 1980)(applying Iowa law). Rembrandt's two (2) express warranties go to the essence of the contract, specifying the "volume" and "location" of the eggs, and enforcing the disclaimer would nullify the purpose of those terms.

## IV.   RQE'S CONTINUED PERFORMANCE WAS "EXCUSED" PURSUANT TO THE PURCHASE AGREEMENT, AND BECAUSE OF COMMERCIAL IMPRACTICABILITY/FRUSTRATION.

In addition to pre-existing material breaches of the Purchase Agreement, summary judgment in favor of Rembrandt is not appropriate because RQE's continued performance under the Purchase Agreement was "excused."

### A.   Section O of the Purchase Agreement

First, RQE was excused from its continued performance of the Purchase Agreement pursuant to Section O, because consumer demand significantly and unexpectedly fell. Section O of the Purchase Agreement provided that:

> Any delay or failure of either party to perform its obligations under this Agreement shall be excused if, and to the extent that the delay or failure is caused or materially contributed to by force majeure or other acts or events beyond the reasonable control of a party hereto.

(Doc. 72-1). While Rembrandt and RQE believed in entering the contract that there would be significant demand for cage-free specialty eggs from approximately October 2016 to October 2017, there was a significant lack of consumer demand for cage-free shell eggs in May and June of 2017. Rembrandt's internal emails show that in March and April of 2017 Rembrandt quoted a $0.95-$1.05 per dozen price to Rose Acres for cage-free shell eggs, but by June of 2017 Rose Acres was not interested. (Doc. 89-4 at 34). Further, Rembrandt's quoted price of $0.55 per dozen to another customer was "pretty high." (Doc. 89-41 at 5). As a result of the lack of demand, RQE's purchaser Hickman informed RQE it would stop taking loads, and RQE could

not find another purchaser after making considerable efforts to find a buyer. (Doc. 89-14 at 2) These facts fall under Section O, excusing RQE's performance, because lack of consumer demand was beyond RQE's control and because it caused or materially contributed to RQE's failure to perform.

The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999)(citation omitted). Thus, if the parties' intent is clear and unambiguous from the words of the contract, courts enforce the contract as written. *Howard v. Schildberg Constr. Co.*, 528 N.W.2d 550, 555 (Iowa 1995). However, "when there are ambiguities in a contract, they are strictly construed against the drafter. *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981). "Ambiguity exists when, after application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty exists concerning which of two reasonable constructions is proper." *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988).

Here, the language of Section O explicitly favors excusing RQE's performance. In interpreting the intent of RQE and Rembrandt at the time of entering the Purchase Agreement, the Court should focus on Rembrandt's use of Section O, the identical provision, in its dispute with Continental Mills approximately a year before entering the Purchase Agreement with RQE. In that dispute, Rembrandt specifically used Section O to "excuse" its performance under a supply contract because of its inability to "supply" egg loads to Continental Mills. (Doc. 89-3 at 57-59). Unlike the force majeure event of lack of supply in that dispute, this dispute involves the

31

other side of the coin, lack of demand. Nevertheless, at his deposition Rettig agreed that "[s]upply and demand determine price in general," so both supply and demand always have to be addressed. (*Id.* at 38-39, ln. 54:21-24). Rembrandt understood at the time of entering the Purchase Agreement that RQE's contractual obligations could be affected by lack of consumer demand. Further, because Rembrandt drafted the Purchase Agreement (Section O was included in all drafts), the Court should strictly construe it against Rembrandt if Section O is found to be ambiguous.

In *American Soil Processing, Inc. v. Iowa Comp. Petroleum Underground Storage Tank Fund Bd.*, the Iowa Supreme Court found that there was a question of fact as to whether "a factfinder could reasonably conclude that the legislature and the IDNR enacted changes to the underground storage tank regulatory scheme that put it beyond the reasonable control of the Board to provide the annual tonnage of contaminated soil required under the Agreement." 586 N.W.2d 325, 335 (Iowa 1998). Accordingly, the Supreme Court reversed the order granting summary judgment and remanded the case to the district court to conduct further proceedings on that issue. *Id.* at 336. While RQE does not believe Section O affords any ambiguity, the parties' intent, when conflicting, presents a question of fact for determination by a fact finder.

### B. Commercial Impracticability and Frustration

Second, notwithstanding Section O of the Purchase Agreement, RQE performance under the Purchase Agreement became "commercially impracticable" or "commercially frustrated" due to the occurrence of two (2) events outside of its control. The doctrine of commercial impracticability or frustration stems from the common law doctrine of impossibility, a defense recognized by Iowa law. *See Nora Springs Co-op. Co. v. Brandau*, 247 N.W.2d 744, 747-48 (Iowa 1976)("The doctrine of impossibility of performance is recognized in Iowa as an excuse

for nonperformance generally where that which has been promised becomes Objectively impossible to perform due to no fault of the nonperforming party."). The UCC "replaces the requirement of objective Impossibility by a standard of Impracticability." *Id.* (*citing* I.C.A. § 554.2615).[16] "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1981). In these circumstances, "the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable." *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.*, 580 N.W.2d 802, 806 (Iowa 1998).

The first event outside of RQE's control was the deterioration of egg quality and reduction in the Tipton Farms' egg supply starting in April of 2017 and continuing in May and June of 2017. Although RQE was not informed of the outbreak of MG at the Tipton Farms, it did have knowledge of the grade-out reports showing "checks" and "under grades" at rates higher than the Quality Specification. RQE was also aware of the increasing number of egg loads being supplied from non-Tipton Farms. Because MG can cause reduced egg production and can affect egg quality, it is likely that MG was causing these problems with the Tipton Supply. This is also evidenced by the depopulation of those barns in April, July, August, and September of 2017. Both the deterioration of egg quality and supply from other locations made the Purchase Agreement "less desirable" and "more burdensome" on RQE than initially agreed to.

---

[16] "The explanations in Comment 9 make it evident the provisions should also be equally applicable to buyers. Thus, the Code expressly recognizes the doctrine of 'commercial frustration' which has been increasingly utilized as an additional excuse for nonperformance in certain instances." *Nora Springs*, 247 N.W.2d at 748.

The second event was the significant lack of consumer demand in May and June of 2017. Evidence shows that it became commercially impracticable for RQE to continue to purchase the Shell Eggs after Hickman stopped issuing purchase orders to RQE, and RQE could find no other buyers. The price for cage-free eggs significantly fell during this time, and there was a sudden and unexpected drop in consumer demand for cage-free eggs. (Doc. 89-3 at 53, ln. 72:7-16); (Doc. 89-4 at 34); (Doc. 89-14 at 2); (Doc. 89-41 at 5). Anticipating this defense, Rembrandt argues that RQE "never alleged they were unable to take deliver of the eggs or pay for them, and the only evidence of their financial condition is that they have '$30 million+' in assets and earn annual revenues of '10 million'–more than enough to pay for the eggs." (Doc. 81 at 23-4).

Rembrandt's preemptive argument seemingly relates to "objective impossibility," that it was objectively possible for RQE to take egg loads. However, the impossibility standard has been abrogated by "impracticability." According to Iowa law, all that is needed is a showing that it became "more burdensome or less desirable" for RQE to take the loads in addition to the condition or events stated above. *Mel Frank*, 580 N.W.2d at 806. Thus, RQE's assets and revenues are irrelevant. Further, Rembrandt itself recently argued "frustration of purpose" in a dispute with Dahmes Stainless, Inc. ("Dahmes") over the purchase of an industrial egg dryer ("Equipment") under a contract. *See Rembrandt Enterprises, Inc. v. Dahmes Stainless, Inc.*, 2017 WL 3929308 (N.D. Ia.–Western Div. 2017)(Strand, J.).[17] In that case, Rembrandt argued that "Rembrandt had no use for [the Equipment] unless it was installed in a facility capable of producing and processing such an enormous volume of eggs," and "the Avian Flu outbreak frustrated its ability to build the Thompson facility and that the outbreak was outside its control." *Id*. Considering Rembrandt's argument here, Rembrandt likely had the resources in the dispute

---

[17] Rembrandt's motion for summary judgment was granted in part and denied in part. Subsequently, Rembrandt was awarded a favorable ruling at trial on its "frustration of purpose" argument, which is being appealed to the Eighth Circuit Court of Appeals.

with Dahmes to purchase the Equipment, but due to a subsequent condition – the avian influenza – Rembrandt no longer needed the Equipment and its purpose was "frustrated." Applying Rembrandt's argument to this case, RQE no longer needed the Tipton Supply due to both the outbreak MG affecting quality and location of the eggs, and the significant and unexpected drop in consumer demand.

Accordingly, whether RQE continued performance was "excused" is a question of fact.

## V.   RQE IS A PARTNERSHIP; DYLAN REXING CANNOT BE INDIVIDUALLY LIABLE TO REMBRANDT.

Under Indiana law, RQE is a partnership.[18] For more than 20 years, Joe and Leo Rexing have agreed to operate RQE and split the profits. (Doc. 89-15). At all times relevant, Dylan Rexing acted as an agent of RQE (executing the Intent to Purchase Eggs and the Purchase Agreement as RQE's "VP of Operations"), and Dylan does not share in RQE's profits. (Doc. 89-13). Summary judgment against Dylan Rexing, individually, is not appropriate as he is not a partner of RQE and not alternative theory of liability has been proposed by Rembrandt.

### CONCLUSION

Because numerous genuine issues of material fact remain, Rembrandt is not entitled to summary judgment as a matter of law.   The Court should deny Rembrandt's Motion for Summary Judgment, and the case should proceed to trial on the merits of both parties' claims.

---

[18] "A partnership is an association of two or more persons to carry on as co-owners of a business for profit. *Life v. F.C. Tucker Co.*, 948 N.E.2d 346, 351 (Ind. Ct. App. 2011). The two requirements of a partnership are: (1) a voluntary contract of association for the purpose of sharing profits and losses which may arise from the use of capital, labor, or skill in a common enterprise; and (2) an intention on the part of the parties to form a partnership. *Id*. at 352.

Dated: September 4, 2018                    Respectfully submitted,

                                            **JACKSON KELLY PLLC**

                                            *s/* James D. Johnson
                                            James D. Johnson, 11984-49
                                            Spencer W. Tanner, 32436-49
                                            221 N.W. Fifth Street
                                            P.O. Box 1507
                                            Evansville, IN 47706
                                            Phone: (812) 422-9444
                                            Fax: (812) 421-7459
                                            E-Mail: jdjohnson@jacksonkelly.com;
                                                    spencer.tanner@jacksonkelly.com
                                            *Counsel for Plaintiff & Counterclaim Defendants*


### CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2018, the foregoing was electronically filed using the court's E-Filing System ("EFS") and was served upon the following counsel of record via EFS:

| | |
|---|---|
| Matthew R. Veenstra | Dirck H. Stahl |
| Alain M. Baudry | Cliff Whitehead |
| **KUTAK ROCK LLP** | **ZIEMER STAYMAN WEITZEL** |
| 60 South Sixth Street, Suite 3400 | **SHOULDERS LLP** |
| Minneapolis, MN 55402 | 20 NW First Street |
| matthew.veenstra@kutakrock.com | Evansville, IN 47706 |
| alain.baudry@kutakrock.com | dstahl@zsws.com |
| | cwhitehead@zsws.com |

                        *s/* James D. Johnson