UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| REXING QUALITY EGGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00141-JMS-MPB |
| | ) | |
| REMBRANDT ENTERPRISES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| REMBRANDT ENTERPRISES, INC., | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REXING QUALITY EGGS, | ) | |
| LEO R. REXING, | ) | |
| DYLAN REXING, | ) | |
| JOSEPH L REXING, | ) | |
| | ) | |
| Counter Defendants. | ) | |

## <u>ORDER</u>

In 2016, Rembrandt Enterprises, Inc. ("Rembrandt") entered into an agreement to sell cage-free eggs to Rexing Quality Eggs ("Rexing"), the doing-business-as designation for Leo and Joseph Rexing's egg selling partnership.[1]  The contract required Rembrandt to provide Rexing with approximately 3,240,000 eggs per week for one year,[2] subject to possible extensions.  But cracks quickly formed in parties' relationship, which ultimately spoiled, leaving 16 weeks-worth

---

[1] As used in this Order, "Rexing" refers to the unincorporated Rexing Quality Eggs partnership and "the Rexings" refers collectively to all of the Counterclaim Defendants.  For the sake of clarity, the Court refers to the individual members of the Rexing family by their first names.

[2] This estimate is based upon the contract's provision of 12 loads per week, where "load" is defined as a minimum of 25 pallets, at 900 dozen eggs per pallet.  [*See* Filing No. 81 at 7.]

of ordered eggs (over 50 million eggs) on Rembrandt's kitchen table. This lawsuit followed. Rexing alleges that its continued performance was excused and that Rembrandt sold deficient eggs. Rembrandt counterclaims, alleging that Rexing breached the contract by refusing egg shipments and repudiating the purchase agreement.

Rembrandt's partial Motion for Summary Judgment, [Filing No. 71], currently pends before the Court. After unscrambling the hundreds of pages of briefing and exhibits filed by the parties, what remains is a relatively straightforward matter of contract interpretation. The contract and undisputed evidence demonstrate that Rexing's nonperformance was not excused by the change in economic demand, and that Rembrandt did not breach any express warranty. Rather, Rexing unilaterally terminated the contract after determining that the deal was not all that it was cracked up to be. However, Rembrandt's claim for summary judgment on damages does not even begin to penetrate the eggshell. The Court therefore **GRANTS IN PART** and **DENIES IN PART** Rembrandt's Motion.

## I.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not suffice to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as

to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### PROCEDURAL HISTORY

This matter was first filed by Rexing on August 16, 2017 in state court. [Filing No. 1-1.] Rexing seeks a declaration that its continued acceptance of eggs was excused by the "significant and unexpected reduced consumer demand" for cage-free eggs and seeks damages for Rembrandt's alleged breach of express warranties as to the quality of the eggs. [Filing No. 1-1 at 3-4.] On September 9, 2017, Rembrandt removed the lawsuit to this Court. [Filing No. 1.]

Rembrandt counterclaimed against Rexing on October 6, 2017, [Filing No. 9], and, with leave of court, [*see* Filing No. 18], amended its counterclaim to join Dylan, Joe, and Leo as Counterclaim Defendants, [Filing No. 15]. Rembrandt's operative pleading alleges that the Rexings breached the purchase agreement and a separate credit agreement, and seeks damages, attorney's fees, and interest as provided by the contracts. [Filing No. 15.]

On August 7, 2018, Rembrandt filed its Partial Motion for Summary Judgment. [Filing No. 71.] Rembrandt seeks judgment in its favor as to Rexing's claims, which it argues fail as a matter of law. [Filing No. 71.] In addition, Rembrandt seeks affirmative judgment on its own claim for breach of the purchase agreement, arguing that the undisputed evidence demonstrates that it must prevail as a matter of law. [Filing No. 71.] Finally, Rembrandt argues that it has proven the amount of its damages as a matter of law. [Filing No. 71.] Rexing, on the other hand, did not cross-move for summary judgment, leaving Rembrandt's Motion as the only dispositive motion for the Court's consideration.

### III.
### BACKGROUND

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005). This recitation, moreover, is limited to the facts relevant to, and helpful for understanding, the Court's ultimate decision on the instant motion. Additional facts, particularly those argued by the parties to be relevant, are referenced as appropriate in the discussion of the parties' arguments.

### A. The Parties

Rembrandt's chickens produce a lot of eggs, most of which Rembrandt dehydrates or liquifies before selling to other food product manufacturers. [Filing No. 89-3 at 2-7; Filing No. 89-3 at 18.] In 2016, Rembrandt began expanding into the cage-free egg market due to rising demand for cage-free eggs. [Filing No. 89-3 at 15.]

Joseph and Leo Rexing are brothers who own and have owned various agribusinesses. [Filing No. 74 at 4.] Among their enterprises is Rexing Quality Eggs, which is the unincorporated trade name under which Joseph and Leo Rexing have bought and sold eggs for over 20 years. [Filing No. 74 at 7; Filing No. 89-15 at 2.] Joseph's son, Dylan Rexing, was Vice President of Operations for Rexing Quality Eggs, though he neither received any of the partnership's profits nor shared in its losses. [Filing No. 73 at 4; Filing No. 89-13.] Dylan, then aged 25, conducted all negotiations with Rembrandt on behalf of Rexing, which were his first major negotiations for the sale of eggs. [Filing No. 73 at 12-13; Filing No. 74 at 8.] Before their contract with Rembrandt, the Rexings bought and resold eggs on the spot market, mostly to institutional and warehouse

purchasers.  [Filing No. 74 at 4-5.]  They had never before engaged in a fixed-term commitment to buy eggs.  [Filing No. 74 at 4.]

### B. Rembrandt and Rexing Discuss Potential Deals

Rembrandt first came across Rexing in spring 2015 when it was searching for egg producers to fill its needs after it had lost most of its birds to the avian influenza epidemic.  [Filing No. 89-5 at 3-4; Filing No. 89-5 at 44.]  Initially, Rembrandt discussed with Dylan the possibility of hiring Rexing as a "contract manufacturer" (essentially a packaging middleman, never producing or owning the eggs) to grade and package cage-free eggs which would in turn be sold to Walmart.  [Filing No. 73 at 13-14; Filing No. 89-5 at 46-47.]  The Walmart deal never came to fruition.  [Filing No. 73 at 14.]

Talks between Rembrandt and Dylan then turned to two farms in Tipton, Missouri, where Rembrandt had entered into supply contracts for the production of eggs.  [*See* Filing No. 89-2; Filing No. 73 at 14.]  Under this proposal, Rexing would not act as a contract manufacturer, but would instead purchase the eggs from Rembrandt.  [*See, e.g.*, Filing No. 73 at 14; Filing No. 89-17.]

### C. The Contract

Dylan and Rembrandt reached an agreement for Rexing to purchase at least one-year's worth of eggs, as memorialized in a contract dated September 2, 2016:[3]

---

[3] Several terms from the contract have standard industry definitions. "Grade A" refers to eggs that may be sold to retail consumers.  [Filing No. 78 at 2.]  "Shell eggs" refers to whole, ungraded eggs. [*See* Filing No. 78 at 2; Filing No. 89-3 at 45-46.]  "Restricts" are dirty or cracked eggs that are unsuitable for retail but may be used as breaking stock for liquid egg products.  [Filing No. 78 at 2.]  "Losses" are broken eggs that may neither be graded nor sold.  [Filing No. 78 at 2.]  The "High Side Breaker Market" is a generally-known reference point for breaking stock.  [Filing No. 73 at 19.]

Parties:    Rembrandt Enterprises, Inc.        Rexing Quality Eggs
              1521 18th Street               4501 Hitch Peters Road
              Spirit Lake, Iowa 51360       Evansville, IN 47711

              ("Rembrandt")               ("Purchaser")

Date:  September _2_, 2016

A.    **Product:**    White Nest Run Shell Eggs (the "Shell Eggs") meeting the requirements contained on Exhibit A, attached hereto.

B.    **Volume:**    Purchaser shall purchase, and Rembrandt will supply, twelve (12) loads of Shell Eggs per week during the Term, as hereinafter defined, commencing the week of October 3, 2016. For purposes of this Agreement, a "load" is comprised of no less than 25 pallets (or such lesser number of pallets as are may be required to avoid violating applicable gross weight transportation requirements,) with approximately 900 dozen Shell Eggs per pallet. The Parties have agreed to permit Rembrandt a period of time to meet this schedule. Without limitation, the schedule below is a tentative ramp up schedule expected to be in place for deliveries through the week of December 25 (the "Ramp Up Period,") whereby Rembrandt has the right to source certain loads from other locations, and to supply less than twelve loads per week, until all loads can be supplied from Tipton, Missouri location:

| Start Date | Tipton, MO Loads | Loads Other Locations | Total Loads |
|---|---|---|---|
| 10/3/2016 | 6 | | 6 |
| 10/10/2016 | 7 | 1 | 8 |
| 10/17/2016 | 9 | 3 | 12 |
| 10/24/2016 | 10 | 2 | 12 |
| 10/31/2016 | 10 | 2 | 12 |
| 11/7/2016 | 10 | 2 | 12 |
| 11/14/2016 | 10 | 2 | 12 |
| 12/25/2016 | 11 | 1 | 12 |
| 2/12/2017 | 12 | | 12 |

C.    **Price:** The price ("Price") for Shell Eggs purchased by Purchaser hereunder for the Initial Term, as hereinafter defined, shall be $0.85 per dozen, FOB, Tipton, Missouri, or, during the Ramp Up Period, from other locations designated by Rembrandt. In the event that Rembrandt designates an alternative location for pick up of the Shell Eggs by Purchaser, the Price for the Shell Eggs shall be $0.80 per dozen, FOB such alternative location. The Price for Shell Eggs for each Continuation Term thereafter shall be mutually agreed upon between the parties, as specified in Section F.

D.    **Freight/Transportation/Loading:** Purchaser is responsible for arranging and paying for any necessary transportation from the origination point. Rembrandt shall, however, be responsible for completing all loading of eggs onto trucks. Purchaser may, from time to time, provide recommendations and guidance upon desired loading procedures; provided, that any changes from Rembrandt loading practice will be mutually agreed upon. Loading shall take place at mutually agreed upon dates and times; provided, that all loading shall be required to occur between 7:00 a.m. and 4:00 p.m. during any loading day. Purchaser shall supply all required materials (i.e., without limitation, all pallets, flats, boards) necessary to packing and shipping the Shell Eggs for Purchaser hereunder. All such materials are to be properly washed clean, sanitized and dried by Purchaser at Purchaser's facility (and at Purchaser's expense) prior to providing materials to Rembrandt's facility for use in egg packing.

[Paragraph E., "Payment," is omitted.]

F. **Term of Agreement:** This Agreement will be for an initial term commencing as of October 3, 2016 ("Commencement Date") and terminating October 3, 2017 (the "Initial Term"). Thereafter, this Agreement shall continue for three (3) year one year periods thereafter (each, a "Continuation Term," and together with the Initial Term, the "Term,") unless terminated by either party upon written notice to the other party at least three (3) months notice prior to the expiration of the Initial Term or any Continuation Term thereafter. If Rembrandt's decision to terminate is based upon an offer with improved pricing or other terms and conditions from a third party, Rembrandt will, accompanying such notice, provide to Purchaser a summary of the material terms of such third party offer. If Purchaser, does not, within fifteen (15) days of receipt of such third party offer, agree (in a form satisfactory to Rembrandt) to match the terms of such third party offer, Rembrandt will be entitled to pursue such third party offer, and this Agreement shall terminate as provided in this Section. Notwithstanding the foregoing, if the

Price for Shell Eggs is not mutually agreed upon at least two (2) months prior to the commencement of any Continuation Term, either party shall be entitled to terminate this Agreement upon written notice the other party.

G. **Specifications:** Rembrandt will produce and supply Shell Eggs according to the specifications set forth in Exhibit A, attached hereto and part hereof.

H. **Title and Risk of Loss:** Title and Risk of loss to Shell Eggs shall pass to Purchaser upon loading at in Tipton, Missouri, or such other location designated by Rembrandt for loading hereunder.

I. **Warranties:** Rembrandt represents and warrants to Purchaser that all Shell Eggs sold to Purchaser pursuant to this Agreement will not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, and not be an article which may not be introduced into interstate commerce under the provisions of Section 404 or 405 of such act. NO OTHER REPRESENTATION OR WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, OR OTHERWISE ARE MADE OR INTENDED BY REMBRANDT WITH RESPECT TO THE SHELL EGGS, AND REMBRANDT SPECIFICALLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

J. **Attorneys' Fees:** The prevailing party shall be entitled to attorneys' fees and costs of collection in any dispute arising under this Agreement.

K. **Assignment:** This Agreement shall not be assigned by either party without the other party's prior written consent. Notwithstanding the foregoing, the parties agree that Rembrandt shall be entitled to assign its right to payment under this Agreement as partial security for financing, to the financial institution(s) which have provided financing to Rembrandt.

L. **Governing Law:** This Agreement shall be governed by and construed under the laws of the State of Iowa.

M. **Other Terms:** In no event shall Rembrandt be responsible for any lost profits, or any special, indirect, incidental, consequential, or punitive damages, even if advised in advance of the possibility of such damages.

N. **Waiver:** The failure of either party to insist in any one or more instances upon performance of any terms or conditions of this Agreement shall not be construed as a waiver of future performance of any such terms and conditions, but the obligations of each party shall continue in full force and effect.

O.    **Force Majeure:** Any delay or failure of either party to perform its obligations under this Agreement shall be excused if, and to the extent that the delay or failure is caused or materially contributed to by force majeure or other acts or events beyond the reasonable control of a party hereto. During the period of the delay or failure to perform by Rembrandt, the Purchaser may, at its option, purchase Shell Eggs from other sources.

P.    **Entire Agreement:** This writing constitutes the entire understanding of Rembrandt and Purchaser and supersedes all previous agreements, proposals or negotiations, between the parties with respect to the subject matter hereof. No modification, alteration or change in the terms hereof shall be effective unless made in writing and signed by both Purchaser and Rembrandt.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date written below.

REMBRANDT ENTERPRISES, INC.    REXING QUALITY EGGS

Title: _President_    Title: _VP of Operations_

Date: _9.4.16_    Date: _9-2-16_

[Filing No. 72-1 at 1-5.] As referenced in paragraph A of the contract, attached Exhibit A provided the following "Specifications":

## EXHIBIT A
## SPECIFICATIONS

**Each load with be inspected at loading, and all Shell Eggs will be supplied in compliance with the following specifications:**

**Egg Specifications** – All Shell Eggs shall be white eggs.
Average case weights for each load of Shell Eggs shall be between 47 lbs. and 52 lbs. Shell Eggs loaded into Purchaser pick up vehicles shall be no older than 7 days from the date of lay.

**Certified Humane** – All facilities producing Shell Eggs under this Agreement shall be certified by Humane Farm Animal Care, or an appropriate successor organization, as "Certified Humane" or its equivalent, based upon the standards in effect as of the date of this Agreement. In the event of a change in the requirements to obtain certification after the date of this Agreement, the parties shall adjust the Price of the Shell Eggs hereunder to reflect the cost associated with Rembrandt implementing necessary changes. If Purchaser does not request Rembrandt to implement any necessary changes to maintain "Certified Humane" certification, the Purchaser may choose to go with an equivalent or successor organization; provided, that any changes required by Rembrandt to comply with the requirements of such equivalent or successor organization shall require an adjustment to the Price of the Shell Eggs hereunder to reflect the cost associated with Rembrandt implementing any necessary changes.

**Inspection and Grading** -- All Shell Eggs hereunder shall be inspected within ten (10) business days of receipt by Purchaser at the Purchaser's _Rose Acre_ , _AR_ facility, and Purchaser shall be obligated to notify Rembrandt, in writing, within such ten (10) business day period of any failure to conform with the specifications and requirements herein. With respect to each load of Shell Eggs, ninety-one and a half percent (91.5%) of such Shell Eggs shall grade out as Grade A, and specifically, no more than eight and a half percent (8.5%) of any load of Shell Eggs shall grade out as restricts or losses. With regard to any load in which in excess of eight and a half percent (8.5%) of Shell Eggs grade as restricts or losses (such excess restricts and losses in a load hereinafter the "Excess Losses") as reported, in writing, to Rembrandt (with grading documentation attached) no later than ten (10) business days following receipt by Purchaser of such load, Rembrandt shall issue a credit for such Excess Losses, so that the payment by Purchaser for such Shell Eggs comprising the Excess Losses will be equal to five cents back of the High Side Breaker Market quoted on the Thursday prior to the date of shipment, in lieu of the payment specified in this Agreement. Notwithstanding the foregoing, in no event shall a deduction on any load of Shell Eggs exceed a deduction on ten percent (10%) of the Shell Eggs in such load.

In the event of any material breach of any of the specifications noted above, Purchaser shall provide immediate notice to Rembrandt and an opportunity to review and confirm the failure. As Purchaser's sole remedy for such non-compliance, Purchaser shall have the right to reject any load in which the parties agree upon such non-compliance, and Rembrandt shall be responsible in the case of a rejected load, for reimbursing Purchaser its cost incurred for freight to deliver such load to Purchaser's grader, and Rembrandt shall be responsible for the freight to return the shipment to Rembrandt's designated location.

The parties may from time to time agree upon changes in production by Rembrandt in order to achieve certain agreed upon specialty egg characteristics. Prior to implementing any such change, the parties shall agree to an adjustment in the Price under this Agreement to compensate Rembrandt for implementing any such change.

Rembrandt shall be entitled to observe the grading process to validate the calculations of Shell Eggs qualifying as restricts and losses. In the event of disagreement with the number of Shell Eggs grading out as restricts and losses Rembrandt shall be entitled to require an independent evaluation or review of the Shell Eggs, to validate the determination of restricts and losses.

[Filing No. 72-1 at 5-6.]

In reaching these terms, the parties engaged in negotiations via telephone and email. Rexing sought, among other things, "a clause for use [sic] to get out of this contract based on poor performance." [Filing No. 72-10 at 1 (email from Dylan dated August 23, 2016); Filing No. 72-11 at 1 (email from Dylan dated August 31, 2016, seeking a "[c]lause in the contract for immediate cancelation based on poor egg performance").] The final contract contained no provision allowing for "immediate cancelation," but did contain the rejection provision of Exhibit A, excerpted above (in the paragraph beginning "In the event of any material breach . . . ."). A previous draft had omitted the language providing that "Rembrandt shall be responsible in the case of a rejected load, for reimbursing Purchaser for its cost . . . ." [Filing No. 72-12 at 7.]

The parties also specifically negotiated the scope of the "Excess Loss" provision of Exhibit A, which as set forth above gives Rexing a certain credit (essentially a discount) for loads "in which excess of eight and a half percent (8.5%) of the Shell Eggs grade as restricts or losses." [Filing No. 72-1 at 5-6.] One proposed version of the contract limited Rexing to a credit "so that the payment" for the deficient eggs would be "equal to the High Side Breaker Market." [Filing No. 72-9 at 6.] Dylan responded as follows:

> 6.) Inspection/Grading: Rembrandt is Guaranteeing a 91.5% grade out to be able to be merchantable basically. If we come to a part where it gets over that amount or excessive, we want to make sure we are not on the short side of the stick. By that I mean, we would like to have Rembrandt pick up that product and give credit (If that makes sense).

[Filing No. 72-10 at 1.] Several days later, Dylan again wrote Rembrandt about his concerns, stating:

> 3.) Im going to need to go over the portion about losses over 8.5% tomorrow. Dad wants me to push some on this subject to come to a more defined answer. Reason being, if we pay Caldwell to grade these eggs for instance .15 cents/DZ I am paying .85 from you and your guaranteeing me at least the high side of the breaker market we are going to be losing here. How can we fix?

[Filing No. 72-11 at 1.] In its final version, the contract provided that Rembrandt would credit Rexing for excess losses so that Rexing would pay "equal to five cents back of the High Side Breaker Market" for such eggs. [Filing No. 72-1 at 6.]

### D. Contractual Performance

At the time Rembrandt and Rexing executed the contract, Rexing intended to resell the eggs to Hickman's Family Farms, which would in turn resell the eggs to a large retailer. [Filing No. 73 at 13-14.] Rexing and Hickman's, however, only reached a nonbinding "letter of intent," [Filing No. 72-13 at 2], which ultimately never progressed into a long-term contractual relationship, [*see* Filing No. 72-4 at 13]. Without a long-term contract with Hickman's, Rexing

had no alternative customer in line to purchase the significant quantity of eggs bought from Rembrandt.  [Filing No. 73 at 9; Filing No. 74 at 11-13.]

Rexing received its first shipment of eggs at the end of September 2016.  [Filing No. 89-10 at 40.]  After the "Ramp Up Period" agreed to by the parties, Rexing received 12 truckloads of eggs each week, as set forth in the purchase agreement.  [Filing No. 78 at 3.]  The quality of the initial loads was low.[4]  [Filing No. 89-8 at 15-28.]  Dylan sent Rembrandt emails on October 6 and October 25, complaining about the poor egg quality.  [Filing No. 89-10 at 5-6.]  Dylan visited the Tipton farms in that first month and reported that Rembrandt had not done "quality checks" on the eggs.  [Filing No. 73 at 41.]  Rembrandt also sent an employee to the Tipton farms who believed that there were "two main issues . . . [:] shell quality and equipment."  [Filing No. 89-6 at 37.]  In response, the Tipton farms made several changes to the equipment and bird nutrition.  [Filing No. 89-6 at 23-24; Filing No. 89-7 at 18-20.]  Rembrandt also notified one of the two Tipton farms that it would begin charging for the farm's underperformance.  [Filing No. 89-44.]  On November 25, Dylan emailed Rembrandt complaining of continuing quality concerns: "Our contract calls for 91.5 quality which are running 81.64-82.64.  This is 8.86-9.86 off of our numbers."  [Filing No. 89-10 at 6.]

In January 2017, a Mycoplasma gallisepticum ("MG") outbreak[5] hit the Tipton, Missouri area.  [*See* Filing No. 89-26.]  Emails sent in March 2017 reflected Rembrandt's concern that there

---

[4] Rexing asserts that "the USDA sampled the [first] load and determined that the load needed to be rejected."  [Filing No. 90 at 14 (citing Filing No. 89-8 at 15-20).]  But while Filing No. 89-8 at 15-20 contains emails and a USDA sampling sheet, nowhere is there any mention of a rejected load.

[5] MG is a bacterium which causes chronic respiratory disease in chickens.  *National Poultry Improvement Plan*, U.S. DEP'T OF AG. (Apr. 11, 2017), https://www.aphis.usda.gov/aphis/ourfocus/animalhealth/nvap/NVAP-Reference-Guide/Poultry/National-Poultry-Improvement-Plan.

was "something going on with the birds" at the Tipton farms. [Filing No. 89-45 at 2.] In April 2017, Rembrandt began to euthanize its birds at one of the Tipton farms, [Filing No. 89-27], and birds at both Tipton farms tested positive for MG, [Filing No. 89-46]. Egg quality issues remained pervasive from April to June 2017, when Rexing repudiated the contract. [*See* Filing No. 89-10 at 39-47.] During this time, Rembrandt also began supplying eggs from farms outside of Tipton with greater frequency. [Filing No. 78-6.] On April 4, 2017, internal Rembrandt emails expressed concern about ongoing quality problems, explaining that it "ha[d] known about" the problems for "quite some time." [Filing No. 89-4 at 34.] As one email from the inventory control manager explained, "[Over a sample of ] 163 loads, a deduction [for below-standard quality] has been given for 69 of them. When I average the chex/loss [below-grade eggs] for ALL loads, I get 8.55%." [Filing No. 89-4 at 34.]

On May 20, 2017, Dylan emailed Rembrandt expressing his continued concern regarding the egg quality: "Im not taking full volume because quality is lacking and eggs are small at the other farms. As we change flocks, I dont have enough material to spread across 6 sites its just impossible." [Filing No. 89-32 at 1 (misspellings in original).] In late May and early June, shipments were underperforming by over 20 percent, with several loads approaching and exceeding 30 percent under grade. [Filing No. 89-10 at 47.]

Throughout the life of the contract, Rexing received invoices including proper discounts for underperforming loads, as required under the Excess Loss provision of the purchase agreement. [Filing No. 72-16 at 3-4; Fling No. 72-15; Filing No. 78 at 2.] Rexing, however, underpaid the invoices by miscalculating its discount. Rexing subtracted 10 cents from the breaker market price instead of the 5 cents set forth in the purchase agreement. In total, Rexing underpaid $60,059.91. [Filing No. 72-27 at 2-4; Filing No. 73 at 30, 38; Filing No. 72-28 at 5.]

On June 2, 2017, Dylan spoke with Mike Gidley of Rembrandt, and discussed the possibility of rejecting loads. [Filing No. 89-10 at 7.] Mr. Gidley told Dylan that Rexing could not reject loads under the terms of the purchase agreement. [Filing No. 89-10 at 7; Filing No. 89-34 at 1 (internal Rembrandt chat explaining that "we took a much closer look at our supply agreement, as well as your suggestion that Rexing was able to reject loads," and concluding that "we believe our contract is solid" and "Rexing does not have the right to reject loads").]

### E. Repudiation of the Purchase Agreement

In August 2016, when the Rexing-Rembrandt agreement was being finalized, Hickman's believed that it would be able and willing to purchase 11 loads from Rexing for one year, largely due to the demand from Costco, among other retail customers. [Filing No. 72-4 at 3-16.] However, as explained above, Rexing and Hickman's never reached a binding, long-term agreement. [Filing No. 73 at 13-14.] Thus, when Hickman's ramped up its own cage-free production, [Filing No. 72-4 at 12], and faced reduced demand for cage-free eggs, it ultimately stopped buying eggs from Rexing. [Filing No. 72-4 at 6-7; Filing No. 89-9 at 3.] Rexing unsuccessfully tried to find a replacement buyer. [Filing No. 89-14 at 2.]

On May 24, 2017, Dylan emailed Rembrandt, explaining that Rexing would need to cancel orders due to decreased demand. [Filing No. 72-18 at 3.] Rembrandt responded that Rexing would need to take the full loads per the parties' agreement unless Rembrandt could find an alternative buyer. [Filing No. 72-18 at 1.] Unhappy with the situation, Dylan by email dated June 1, 2017 explained that he was "going to try and tell Rembrandt to pound sand," [Filing No. 72-19 at 1], and on June 2, Dylan discussed the possibility of rejecting loads and was told that Rexing could not do so, [Filing No. 89-10 at 7].

After refusing several loads, on June 5, 2017 Dylan emailed Rembrandt, again stating that Rexing would not be able to take their full volume of eggs and writing: "Im sorry to have to put anyone through this, but the cage free business isnt what we were told it was going to be this time of year." [Filing No. 72-20 at 1 (misspellings in original).] Following a conference call later that day, Rembrandt's Egg Sales Desk Manager emailed Rexing:

> Joe and Dylan
> Thank You for taking the time today to discuss the current Rexing cage free egg supply. Since our discussion, I noted that you had sent a notice that would stop our supply agreement from renewing for an additional year after the completion of the initial one year term. As you're aware, the supply agreement is still in effect through October 3, 2017, with the existing weekly purchase requirements of 12 loads per week.
> As we discussed, Rembrandt does expect that Rexing comply with its supply agreement purchase obligations. Last week Rexing only took 8 full truckloads of cage free shell eggs, and as a result, Rembrandt is holding the remaining 4 loads for Rexing's account, and we need direction from you by the end of the day today as to whether we should continue to hold them or attempt to resell them, with any loss by Rembrandt (the difference between the contract price and what we're able to sell these containers for) being reimbursed to Rembrandt by Rexing. We also need to know today what to do with the 8 loads that you've told us you will not be taking next week.
> I indicated that Rembrandt is willing to try to assist by referring possible opportunities to Rexing for sale, or we are open to suggestions you may have to try to resolve this. Given that our cooler space is full, we really need to hear back from you today so that we can take necessary steps.

[Filing No. 72-2 at 1.] Dylan responded:

> Thank you for your email. With the unexpected fall in demand for cage free eggs and the significant reduction in purchase orders provided to us we thought it would be appropriate to allow the expectations under the supply agreement to expire after its first year. Certainly we would plan to continue to work with Rembrandt as a supplier based upon the needs of our customers and Rembrandt's ability to deliver the specified products.
> Rembrandt should not be holding any eggs from last week for the Rexing account at this time. As the market conditions evolve and we are able to adjust to these change in conditions we will plan to work with you toward an amicable resolution.

[Filing No. 72-2 at 1.]

On June 6, 2017, Dylan emailed Hickman's to explain that he had extra eggs "on hand that need to start going away before they go out of date. Im going to cancel all of my orders for this week and order 0 from Rembrandt." [Filing No. 72-7 at 1.] Rexing refused all future loads from that point. [Filing No. 72-7 at 1; Filing No. 72-22 at 1; Filing No. 72-23; Filing No. 72-24; Filing No. 72-25; Filing No. 72-29.] On June 7, 2017, counsel for Rembrandt sent a letter to Rexing, to the attention of Dylan and Joe, demanding assurances that Rexing would accept egg loads in compliance with the terms of the purchase agreement. [Filing No. 72-24.] The letter "advised that Rembrandt intends to resell the shell eggs in the best manner available" and, if it did not receive assurances, would "consider all options, including permanently removing the flock supplying the shell eggs." [Filing No. 72-24 at 2.]

On June 9, 2017, counsel for Rexing responded to the demand for assurances, expressing, among other things, Rexing's belief that the poor quality of the eggs violated an express warranty. [Filing No. 72-25 at 1-2.] As to Rexing's explanation for no longer accepting eggs, counsel wrote as follows:

> Further, and most importantly, the Agreement contains an express provision excusing certain conditions and events from being construed as a default under the Agreement. The Agreement provides that "[a]ny delay or failure of either party to perform its obligations under this Agreement shall be excused if, and to the extent that the delay or failure is caused or materially contributed to by force majeure or other acts or events beyond the reasonable control of a party hereto."
>
> The profoundly reduced market demand for the product provided by Rembrandt is beyond the reasonable control of Rexing, falling under the "other acts" provision of the Agreement. Further, the depressed market conditions for the specified product are a force majeure event under the terms of this Agreement. Both Rembrandt and Rexing contemplated that there would be certain acts outside of their control that would excuse performance by either party, as memorialized in the Agreement.
>
> Rembrandt assumed the risk that Rexing may have to invoke such provisions to excuse its performance by including the provisions in the Agreement. Additionally, Rembrandt is the party who wrote the Agreement, which must therefore be construed against it. In Iowa, courts will look to the intent of the parties to the contract to determine its interpretation, and if there is no ambiguity in the contract, then intent is determined by what the contract says. The Agreement says that force majeure events and other acts beyond the reasonable control of the parties shall excuse the failure of either party to perform its obligations.

> Accordingly, the failure of Rexing to accept the product as set forth in the Agreement is an excusable event under the terms in the Agreement, both under the force majeure clause and the following "other acts" clause. Rexing denies any breach of the Agreement based on market conditions that are beyond its reasonable control. Certainly, if demand increases for Rembrandt eggs, then Rexing would contemplate satisfaction of the purchase requirements in the Agreement.

[Filing No. 72-25 at 2.] Subsequent conversations between counsel for Rembrandt and Rexing confirmed that Rexing would no longer accept any further egg deliveries. [Filing No. 72-29.] 198 truckloads of eggs remained undelivered as of the time of Rexing's repudiation. [Filing No. 78 at 4.]

### F. Post-Repudiation Conduct

In July, August, and September 2017, Rembrandt depopulated several of the Tipton barns due to MG. [Filing No. 89-47; Filing No. 89-48; Filing No. 89-49; Filing No. 89-35 at 2.]

Rembrandt elected not to resell the undelivered eggs on the national egg exchange, called Egg Clearinghouse, Inc., out of concern that doing so would flood the market and cause prices to drop. [Filing No. 77 at 2.] Instead, Rembrandt contacted the exchange and informed them that Rembrandt had supply available for any interested buyers. [Filing No. 77 at 2.] Rembrandt resold 133 of the remaining 198 loads via private sales, attempting to minimize transportation costs by purchasing eggs from egg producers located near the buyers. [Filing No. 78 at 4-5.] For 82 of the 133 loads resold, Rembrandt sourced the eggs from the Tipton farms because the cost of freight was the lowest for the particular buyers. [Filing No. 78 at 4-5.]

For the remaining 65 loads, Rembrandt used the eggs to satisfy its existing commitments to its liquid and powdered egg customers. [Filing No. 78 at 5; Filing No. 72-5.] Rembrandt invoiced Rexing for the difference between the contract price and "the actual market prices at which Rembrandt was able to sell loads to third parties at the same time." [Filing No. 78 at 5.] Rexing has refused to pay the invoiced amounts, and this lawsuit followed.

# IV.
## DISCUSSION

The parties' claims and counterclaims substantially overlap with one another. The Court begins by briefly setting forth general provisions of Iowa law, which governs this case pursuant to the purchase agreement's choice of law provision. The Court then addresses Rembrandt's arguments for summary judgment on Rexing's claim for damages based upon Rembrandt's alleged breach of express warranties. Next, the Court addresses whether Rexing's performance was excused for any reason, analyzing together Rembrandt's argument for summary judgment on Rexing's claim for declaratory relief and on Rembrandt's own claim for summary judgment as to Rexing's liability for breach of contract. Finally, the Court discusses Rembrandt's arguments for summary judgment as to its alleged damages.

### A. Applicable Law

As the parties both acknowledge, the purchase agreement provides that Iowa law applies. Iowa's version of the Uniform Commercial Code, as interpreted and applied by the Iowa courts, therefore provides the governing background principles for resolving this dispute over the sale of livestock. *See Midwest Hatchery & Poultry Farms, Inc. v. Doorenbos Poultry, Inc.*, 783 N.W.2d 56, 61 (Iowa Ct. App. 2010). The Iowa Supreme Court has emphasized that the role of the courts in contract interpretation is to enforce the bargain as intended by the parties at the time of contracting:

> The cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract. We strive to give effect to all the language of a contract, which is the most important evidence of the contracting parties' intentions. Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. Contracting parties have wide latitude to fashion their own remedies for a breach of contract and to deny full effect to such express contractual provisions is

ordinarily impermissible because it would effectively reconstruct the contract contrary to the intent of the parties. Thus, courts generally enforce contractual limitations upon remedies unless such limitations are unconscionable.

*C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011) (internal citations and quotations omitted). The Iowa UCC, moreover, codifies the general obligations of sellers "to transfer and deliver" and of buyers "to accept and pay in accordance with the contract." Iowa Code § 554.2301. While the UCC contains default allocations for risks and burdens between the parties, contracting parties "may not only shift the allocation but may also divide the risk or burden." Iowa Code § 554.2303.

Iowa "long ago . . . abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract" and instead "recognize[s] the rule in the Restatement (Second) of Contracts that states the meaning of a contract 'can almost never be plain except in a context.'" *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) (quoting *Hamilton v. Wosepka*, 154 N.W.2d 164, 171-72 (Iowa 1967)) (citing Restatement (Second) of Contracts § 212 cmt. b (1979)). While all evidence must be considered to ascertain the meaning of a contract, "the words of an integrated agreement remain the most important evidence of intention." *Id.* (quoting *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (quoting Restatement (Second) of Contracts § 212 cmt. e)) (emphasis omitted). Thus, as the UCC provides, the parties' course of dealing "may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Iowa Code § 554.1303. "Wherever reasonable[,] express terms and the course of dealing are to be construed consistent with each other." *Grace Label, Inc. v. Kliff*, 355 F. Supp. 2d 965, 972 (S.D. Iowa 2005) (internal quotation omitted).

### B. Rexing's Claim for Damages

Rexing alleges that Rembrandt breached the terms of the purchase agreement by sourcing eggs from outside of Tipton and by breaching the express warranty as to the quality of the eggs by delivering eggs that did not meet the 91.5 percent Grade A standard. [Filing No. 68 at 3.] As a consequence of Rembrandt's alleged breach, Rexing seeks damages and, as addressed in the next Section, a declaration that it was entitled to repudiate the contract. [Filing No. 68 at 3.] The Court first addresses Rexing's claim that Rembrandt was required to source loads from Tipton after the "Ramp Up Period" ended. This requires addressing the scope of the warranty disclaimer clause of the purchase agreement. The Court next addresses the effectiveness of the limitation of remedies clause, particularly as it applies to Rexing's claims for damages based upon the quality of the eggs.

#### 1. Location Term and The Purchase Agreement's Express Warranties

Rembrandt argues that it did not breach any express warranty because the purchase agreement "warranted only that the eggs would not be adulterated, and that either the eggs would be 91.5% Grade A or the Rexings would receive a discount that lowered the price of Excess Losses to an agreed upon reference price." [Filing No. 81 at 27-28.]

In response, Rexing argues that a genuine issue of fact exists as to whether Rembrandt breached warranties concerning the location at which the eggs would be prepared. [Filing No. 90 at 32-35.] Rexing argues that no warranty disclaimer could disclaim the location term of the contract. [Filing No. 90 at 34-35.]

In reply, Rembrandt argues that the purchase agreement did not specify Tipton eggs and that the parties' course of dealing demonstrates that Rembrandt could source eggs from any farm. [Filing No. 99 at 10-15.]

In surreply, Rexing disputes Rembrandt's interpretation of the location term of the purchase agreement. [*See* Filing No. 102 at 3-4.]

The first issue is the scope of the disclaimer of waivers provision of the purchase agreement. Iowa's UCC provides that a seller may create an express warranty through:

> 1. . . .
>
>> a. Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>> b. Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>> . . .
>
> 2. It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Iowa Code § 554.2313. "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but . . . negation or limitation is inoperative to the extent that such construction is unreasonable." Iowa Code § 554.2316.

Rembrandt briefly suggests that paragraph I of the purchase agreement, which disclaims all express warranties except that the eggs would not be adulterated or misbranded, could preclude Rexing from recovering based upon a breach of either the location or quality terms of the purchase agreement. [*See* Filing No. 81 at 27.] But in the same paragraph, Rembrandt's own statement demonstrates that paragraph I cannot be as broad as it facially purports to be, explaining that "Rembrandt warranted only that the eggs would not be adulterated, and that either the eggs would be 91.5% Grade A or the Rexings would receive a discount that lowered the price of Excess Losses to an agreed upon reference price." [Filing No. 81 at 27.] This second clause, explaining that

Rembrandt warranted "that either the eggs would be 91.5% or the Rexings would receive a discount," does not appear in paragraph I addressed to "Warranties," but instead in the Inspection and Grading provision of Exhibit A: Specifications. While paragraph I would likely be effective to "disclaim implied warranties," *Ltd. Flying Club., Inc. v. Wood*, 632 F.2d 51, 56 (8th Cir. 1980), and perhaps could disclaim express oral warranties or warranties created by sample or model, *see Cannon v. Bodensteiner Implement Co.*, 903 N.W.2d 322, 328-31 (Iowa 2017), it cannot disclaim the terms of the contract itself, *see Select Pork, Inc. v. Babcock Swine*, *Inc.*, 640 F.2d 147, 149 (8th Cir. 1981) (collecting authorities). Iowa's UCC explains that words negating or limiting are generally effective, but "negation or limitation is inoperative to the extent that" it cannot be reasonably construed as consistent with other terms "relevant to the creation of an express warranty." Iowa Code § 554.2316(1). And Comment 4 to the provision on express warranties explains that disclaimers cannot result in a "material deletion of the seller's obligation" under the contract. Iowa Code § 554.2313 UCC cmt. 4.

As Rembrandt effectively concedes, the purchase agreement's warranty is not limited to the statement in paragraph I regarding unadulterated or misbranded eggs but includes the grading specification and credits for excess losses. Rembrandt's own arguments demonstrate that the generic disclaimer cannot simply erase Rembrandt's other obligations under the terms of the purchase agreement. This means that any location term could not effectively be "disclaimed" by the generic disclaimer of paragraph I.

But Rexing's claim runs into other insurmountable obstacles. First, even assuming it were a breach for Rembrandt to source eggs from outside of Tipton after the Ramp Up Period, Rexing would not have been excused from continued performance under the purchase agreement. Iowa's UCC permits a buyer to cancel a contract "[w]henever non-conformity or default with respect to

one or more installments substantially impairs the value of the whole contract." Iowa Code § 554.2612(3). Rexing, however, makes no showing or argument that having to spend more on delivery or packaging from certain locations would impair in any way the value of the whole contract. At most, it may make performance more expensive for Rexing, but cancellation would not be permitted for this reason. Nor could Rexing have rescinded the contract based upon a breach of the location term. Rescission is appropriate only where "(1) the injured party [is not] in default, (2) the breach [is] substantial and go to the heart of the contract, and (3) remedies at law [are] inadequate." *Clark v. McDaniel*, 546 N.W.2d 590, 595 (Iowa 1996). Rexing fails to demonstrate a genuine issue as to any of these requirements, inasmuch as Rexing had underpaid for certain deliveries of eggs and was therefore in default (discussed further below); any alleged breach did not reach the heart of the contract, which was to produce merchantable cage-free white eggs; and any breach could, in the appropriate case, be remedied by damages for the increased expense. In sum, any breach of the location term would not have excused Rexing's continued performance under the purchase agreement.

Next, again assuming that Rembrandt was required to source eggs from only Tipton after the Ramp Up Period, Rexing could not overcome the limitation on incidental and consequential damages from paragraph M of the purchase agreement. [Filing No. 72-1 at 3.] As the UCC explains, "[i]ncidental damages . . . include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods" and consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know." Iowa Code § 554.2715. Rexing argues that sourcing eggs from outside Tipton implicated "shipping and packaging concerns," [Filing No. 90 at 32]—the exact types of incidental and consequential damages that would be precluded by paragraph M.

Finally, the purchase agreement itself contained a mechanism for compensating Rexing when eggs were sourced from outside of Tipton, providing a $0.05-per-dozen discount off the price for Tipton-sourced eggs. [Filing No. 72-1 at 2.] Nothing about that provision, which simply says that "[i]n the event that Rembrandt designates an alternative location for pick up of the Shell Eggs by Purchaser, the Price for the Shell Eggs shall be $0.80 per dozen," [Filing No. 72-1 at 2], suggests that the discount is limited only to loads provided during the Ramp Up Period. Rexing provides no evidence and raises no argument suggesting that it was not billed this discounted rate for loads sourced from outside Tipton. Rembrandt therefore fully complied with its obligations under the purchase agreement. For all of these reasons, Rexing's claim for breach of the location term fails as a matter of law.

### 2. Egg Quality Provision and Limitation of Remedies

Next, the Court must resolve whether Rexing's remedies as to the quality terms are effectively limited by the provisions of the purchase agreement. The parties' positions on this issue are diametrically opposite. Rembrandt maintains that the purchase agreement sets forth all available remedies for any breach and that Rexing waived any of its claims for deficient egg quality by accepting the excess load credits without notifying Rembrandt of any claims. [Filing No. 81 at 26-28.] Rexing argues that the limitations provisions would cause the agreement to fail of its essential purpose.[6] [Filing No. 90 at 33-35.] For the same reasons, Rexing argues that it may

---

[6] Rexing also briefly suggests that because it "retained the right to reject nonconforming egg loads" under the purchase agreement, and because Dylan suggested to Rembrandt that it wanted to reject loads, "Rembrandt was on notice of its continued breach . . . for not meeting the [q]uality [s]pecification," such that the limitation of remedies provision does not preclude its request for damages. [Filing No. 90 at 33-34.] But the purchase agreement, when the full paragraph is considered, provided as follows: "In the event of any material breach of any of the specifications noted above, [Rexing] shall provide immediate notice to Rembrandt and an opportunity to review and confirm the failure." [Filing No. 72-1 at 6.] Nothing in Rexing's submission suggests that Dylan was seeking to invoke that provision to have Rembrandt verify whether a particular load

recover damages beyond the credits enumerated in the purchase agreement, including expenses incurred in preparing to perform its duties under the purchase agreement. [Filing No. 90 at 34.]

Two provisions purport to limit Rexing's remedies for Rembrandt's alleged breaches of the purchase agreement. The first is paragraph M, Other Terms: "In no event shall Rembrandt be responsible for any lost profits, or any special, indirect, incidental, consequential, or punitive damages, even if advised in advance of the possibility of such damages." [Filing No. 72-1 at 2.] The second is Exhibit A, Specifications, "Inspection and Grading":

> **Inspection and Grading** – All Shell Eggs hereunder shall be inspected within ten (10) business days of receipt by Purchaser at the Purchaser's Pose bud , AR, facility, and Purchaser shall be obligated to notify Rembrandt, in writing, within such ten (10) business day period of any failure to conform with the specifications and requirements herein. With respect to each load of Shell Eggs, ninety-one and a half percent (91.5%) of such Shell Eggs shall grade out as Grade A, and specifically, no more than eight and a half percent (8.5%) of any load of Shell Eggs shall grade out as restricts or losses. With regard to any load in which in excess of eight and a half percent (8.5%) of Shell Eggs grade as restricts or losses (such excess restricts and losses in a load hereinafter the "Excess Losses") as reported, in writing, to Rembrandt (with grading documentation attached) no later than ten (10) business days following receipt by Purchaser of such load, Rembrandt shall issue a credit for such Excess Losses, so that the payment by Purchaser for such Shell Eggs comprising the Excess Losses will be equal to five cents back of the High Side Breaker Market quoted on the Thursday prior to the date of shipment, in lieu of the payment specified in this Agreement. Notwithstanding the foregoing, in no event shall a deduction on any load of Shell Eggs exceed a deduction on ten percent (10%) of the Shell Eggs in such load.
>
> In the event of any material breach of any of the specifications noted above, Purchaser shall provide immediate notice to Rembrandt and an opportunity to review and confirm the failure. As Purchaser's sole remedy for such non-compliance, Purchaser shall have the right to reject any load in which the parties agree upon such non-compliance, and Rembrandt shall be responsible in the case of a rejected load, for reimbursing Purchaser its cost incurred for freight to deliver such load to Purchaser's grader, and Rembrandt shall be responsible for the freight to return the shipment to Rembrandt's designated location.

[Filing No. 72-1 at 5-6.]

Remedy limitation clauses for breach of warranty claims are subject to the same principles applicable to limitations of contractual remedies. Iowa Code § 554.2316. Thus, contracts may

---

breached the specification provision. Moreover, Rexing's cursory argument fails to explain how the availability of the remedy of rejecting loads which materially breach the specifications allows Rexing to recover more than the excess loss credits provided in the purchase agreement.

provide for remedies that are different from or more restrictive than the default remedies provided in the UCC except "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose." Iowa Code § 554.2719. The Iowa Court of Appeals has explained what it means for a remedy to "fail of its essential purpose": "A remedy's essential purpose is to give to a buyer what the seller promised him. The focus of analysis is not whether the remedy compensates for all damage that occurred, but that the buyer is provided with the product as seller promised." *Midwest Hatchery*, 783 N.W.2d at 62-63 (internal quotations and citations omitted).

Several cases decided by federal courts applying or relying upon Iowa law have held that contractual remedies failed of their essential purpose where a seller provided nonconforming goods with "readily apparent" defects and where the "contractual limitations of remedies did not contemplate long-term use." *Brown v. Louisiana-Pac. Corp.*, 820 F.3d 339, 351 (8th Cir. 2016) (internal quotations omitted) (collecting authorities). In *Select Pork*, for instance, the court held that a limitation on consequential damages failed of its essential purpose because the underlying goods—"highly-touted special pigs"—were never delivered and were instead substituted with common diseased pigs. 640 F.2d at 150. As the court observed, "Had [the seller] delivered the promised [special pigs], then the clause limiting damages to return of the purchase price would have been reasonable." *Id.* at 149. But the failure to deliver the very goods promised in the product meant that the limited warranty would still deprive the buyer of the benefit of the bargain.

Similarly, in *Hartzell v. Justus Co., Inc.*, the Eighth Circuit applied South Dakota's identical UCC provision and relied upon *Select Pork* in holding that a home builder's performance was so deficient as to deprive the buyer of a repairable home, such that the limited remedy— providing for repair or replacement of defective materials in the home—failed of its essential

purpose.  *693 F.2d 770, 772-73 (8th Cir. 1982).*  Again, the court set forth, for comparison

purposes, what would have been required for the limited remedy to be effective:

> The purpose of a remedy is to give to a buyer what the seller promised him—that is, a house that did not leak. If repairs alone do not achieve that end, then to limit the buyer's remedy to repair would cause that remedy to fail of its essential purpose. . . .
> . . . So here, where the house sold was found by the jury to fall short of the seller's promises, and where repairs could not make it right, defendant's liability cannot be limited to the cost of repairs. If the repairs had been adequate to restore the house to its promised condition, and if Dr. Hartzell had claimed additional consequential damages, for example, water damage to a rug from the leaky roof, the limitation-of-remedies clause would have been effective.

*Id.* at 774.

Select Pork and Hartzell stand in contrast to *Brunsman v. DeKalb Swine Breeders, Inc.*,

where the seller delivered seven boars as required by the contract.  *952 F. Supp. 628 (N.D. Iowa 1996).*  The boars, the buyers alleged, spread congenital tremor syndrome to the offspring they

produced.  The buyers alleged that the limited remedies available, replacement of the boars or

refund, failed of their essential purpose because the remedies provided by the contract bore "no

relation to the damage which might be sustained."  *Id.* at 634.  But the court rejected the buyers'

argument, holding that "Defendant promised to provide boars that conformed to the contract

description and that would settle Plaintiffs' gilts.  Because Plaintiffs did receive the boars as

promised in the contract, there was no failure of remedy in this case and the limitation of remedy

should be enforced."  *Id.* at 635.

These cases "generally instruct us on how § 559.2719 operates."  *Brown*, 820 F.3d at 351.

In each instance, the court determined what the buyer was promised, and then assessed, based upon

the evidence before it, whether the limited remedy deprived the buyer of that promise.  Again, to

reiterate, "[t]he focus of analysis is not whether the remedy compensates for all damage that

occurred," *Midwest Hatchery,* 783 N.W.2d at 62-63, because the very purpose of remedy

limitations clauses is to allow the parties, ex ante, to allocate risk should things go awry, *cf., e.g.*, *SAMS Hotel Grp., LLC v. Environs, Inc.*, 716 F.3d 432, 436 (7th Cir. 2013) ("Limitation of liability clauses serve to establish a contractual ceiling on the amount of damages to be awarded if a plaintiff prevails in later litigation between the contracting parties.").

Here, Rexing was promised cage-free eggs which it could in turn sell to buyers. The parties extensively negotiated over the terms of the quality provision, where Dylan originally sought "a clause for use [sic] to get out of this contract based on poor performance," [Filing No. 72-10 at 1 (email from Dylan dated August 23, 2016); Filing No. 72-11 at 1 (email from Dylan dated August 31, 2016, seeking a "[c]lause in the contract for immediate cancelation based on poor egg performance")], then negotiated from an initial draft which would have discounted eggs from under-performing loads to the breaker market price, to a counteroffer which would have had Rembrandt take back all excess losses, to the final version which provided Rexing with a discounted price five cents under the breaker market price, [*see* Filing No. 72-9 at 6; Filing No. 72-10 at 1; Filing No. 72-11 at 1; Filing No. 72-1 at 6]. That Rexing now believes that deal to be unfair or undercompensating is of no moment. Rexing provides no evidence to suggest that it did not receive the promised cage-free white eggs, or that the eggs were so deficient that they could not in turn be sold to other buyers. As in *Brunsman*, Rexing received the benefit of the bargain and complains only that it has not been compensated for "all damage that occurred." *Midwest Hatchery*, 783 N.W.2d at 62-63. Accordingly, the discount scheme in the purchase agreement does not fail of its essential purpose. And because Rexing does not controvert Rembrandt's evidence that Rexing has received all the discount credits to which it is entitled, Rembrandt is

entitled to summary judgment on Rexing's claims for damages stemming from underperforming loads.[7]

### 3. Conclusion

In summary, Rexing's claim for eggs sourced outside of Tipton fails as a matter of law because Rexing received the agreed-upon discounts and any claim for incidental or consequential damages would be precluded by the damages limitation provision. Even if Rembrandt were required to source all post-Ramp Up Period eggs from Tipton, a breach of that requirement would not have excused Rexing's continued performance. The Court further finds that the damages limitation provisions in the Purchase Agreement do not fail of their essential purpose. Rembrandt is therefore entitled to judgment on Rexing's claim for damages stemming from any loads which failed to reach the 91.5 percent Grade A threshold because Rexing received all of the grade-out credits to which it was entitled. Consistent with the foregoing, the Court **GRANTS** Rembrandt's Motion for Summary Judgment as to Rexing's claim for damages.

### C. Rexing's Repudiation and Claim for Excusal

The Court next addresses Rexing's claim for a declaration that its continued performance was excused by a drop in demand and Rembrandt's overlapping counterclaim for breach of contract due to Rexing's repudiation. Rembrandt argues that it is entitled to summary judgment as to breach because Rexing was required to accept and pay for 12 loads of eggs per week until October 3, 2017, and instead repudiated the agreement in June 2017, refusing to accept or pay for any more loads from that point. [Filing No. 81 at 21-22.] Rembrandt argues that Rexing's force

---

[7] This includes Rexing's claims for preparation expenses in purchasing the loading equipment, which Rexing expressly tied to its "reli[ance] upon the express warranties provided by Rembrandt" as to quality. [Filing No. 102 at 13.] Rembrandt complied with the quality provisions of the purchase agreement by providing the excess credits, so Rexing's claim for preparation expenses fails.

majeure arguments fail as a matter of law because the alleged drop in demand is nothing more than an ordinary risk of doing business. [Filing No. 81 at 23-24.] Rembrandt also argues that it is entitled to summary judgment on its claim that Rexing consistently underpaid for loads on which it received credit for excess losses. [Filing No. 81 at 26.]

In response, Rexing argues that its continued performance was excused under the force majeure clause of the purchase agreement due to a dramatic drop in demand. [Filing No. 90 at 35-37.] Among other things, Rexing argues that Rembrandt similarly invoked an identical force majeure clause in another case based upon the eradication of egg supply with the avian flu outbreak of 2015. [Filing No. 90 at 36-37.] In the alternative, and notwithstanding the force majeure clause, Rexing argues that its continued performance was excused as commercially impracticable or frustrated due to deteriorating egg quality and the decline in demand. [Filing No. 90 at 37-40.]

In reply, Rembrandt reiterates its arguments that a lack of consumer demand does not trigger the force majeure clause. [Filing No. 99 at 7-8.] Rembrandt also reiterates that, apart from the force majeure clause, Rexing was not entitled to rescind the purchase agreement because Rexing was in default, any breach did not go to the heart of the contract, and Rexing retained adequate remedies at law. [Filing No. 99 at 9-10.]

### 1. Force Majeure Clause

Paragraph O, the force majeure clause of the purchase agreement, provides: "Any delay or failure of either party to perform its obligations under this Agreement shall be excused if, and to the extent that the delay or failure is caused or materially contributed to by force majeure or other acts or events beyond the reasonable control of a party hereto." [Filing No. 72-1 at 4.]

It does not appear that the Iowa courts, or, indeed, federal courts applying Iowa law, have engaged in any substantial discussion of the scope of force majeure clauses. The principal case

relied upon by Rembrandt, *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 440 (Iowa 2008), applied Minnesota law—not, as Rembrandt mistakenly asserts, [*see* Filing No. 81 at 24], Iowa law.  And the principal case relied upon by Rexing is a paradigmatic example of a credible claim of force majeure, far away from the facts of this case.  In that case, *American Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Board*, 586 N.W.2d 325, 334-36 (Iowa 1998), the Iowa Supreme Court addressed a contract between a state board and a private soil processing company wherein the board agreed to annually provide a minimum amount of contaminated soil to the processing company.  After the board failed to meet the minimum soil amounts and refused to pay the alternative liquidated damages per the parties' contract, the processing company brought suit.  The board invoked the contract's force majeure clause, arguing that its performance was excused because the legislature had enacted changes to the relevant regulations on underground storage tanks such that it could not provide the agreed-upon volume of contaminated soil.  The Iowa Supreme Court agreed that a change in regulation could constitute force majeure excusing further performance, reversed the grant of summary judgment for the processing company, and remanded the matter for further proceedings.  *Id.* at 335-36.

This case bears no real resemblance either to *American Soil* or to Rembrandt's earlier dealings where it invoked the force majeure clause in response to the avian flu epidemic.  In both instances, the seller faced a dramatic drop in supply due to forces which could not reasonably be anticipated.  Neither maps on to this case, where Rexing asserts that it faced a drop in market demand.  In assessing these issues, to which the Iowa courts have not definitively spoken, the Court turns to persuasive authority to ascertain how the Iowa Supreme Court would most likely rule.  *See BMD Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 679 F.3d 643, 648 (7th Cir. 2012).

A good starting point is the Restatement (Second) of Contracts, upon which the Iowa Supreme Court has relied in similar contexts. *See, e.g.*, *American Soil Processing*, 586 N.W.2d at 330 (quoting Restatement (Second) of Contracts § 261 & cmts. a & f (1981)) (addressing doctrine of discharge by supervening impracticability); *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.*, 580 N.W.2d 802, 805-08 (Iowa 1998) (quoting Restatement (Second) of Contracts ch. 11, at 309-11 (1981); Restatement (Second) of Contracts § 265 & cmt. a (1981)) (addressing doctrines of impossibility of performance and discharge by supervening frustration); *see also Pillsbury Co.*, 752 N.W.2d at 435-36 (citing Restatement (Second) of Contracts § 202 (1979)) (addressing general principles of contract interpretation under Iowa law). One district court addressed a situation much like this one, where the relevant state courts had not specifically addressed force majeure clauses but frequently turned to the Restatement to address similar issues:

> Although the Restatement (2d) of Contracts does not specifically address force majeure clauses, § 261 does provide for discharge of contractual duties by reason of supervening impracticability. This section states:
>
>> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
>
> This section providing for discharge by supervening impracticability incorporates the basis principle, if not language, of the force majeure clause contained in the Agreement. Comment b to § 261 states that "mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section." Based upon the Restatement, Arizona courts would likely find that the force majeure provision does not contemplate or incorporate market shifts or financial inability.

*B.F. Goodrich Co. v. Vinyltech Corp.*, 711 F. Supp. 1513, 1519 (D. Ariz. 1989). Williston's leading treatise likewise reflects the majority view that "[n]onperformance dictated by economic hardship is not enough to fall within a *force majeure* provision. A mere increase in expense does not excuse performance under a *force majeure* provision unless there exists an extreme and

unreasonable difficulty, expense, or injury." Force Majeure Clauses, 30 Williston on Contracts § 77:31 (4th ed. 2004) (footnotes omitted) (collecting authorities). Finally, neither Rexing's briefing nor the Court's research could identify a single case where a mere decline in market demand—absent some major, unpredictable event which caused the shift—constituted force majeure so as to excuse performance.

Under all of these circumstances, and absent any evidence that some legitimately unforeseeable event occurred beyond changes in market demand, the Court concludes that the Iowa Supreme Court would hold the alleged drop in demand to fall outside the scope of the force majeure clause in section O. Unlike the avian flu example, which may plausibly constitute an unforeseeable event precipitating a dramatic change in market conditions, a change in purchaser demand—even a substantial change—is a foreseeable part of doing business. *See, e.g.*, *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 184-85 (Tex. Ct. App. 2018) (citing *Kel Kim Corp. v. Cent. Mkts*, 519 N.E.2d 295, 296 (N.Y. 1987); *Langham-Hill Petrol., Inc. v. S. Fuels Co.*, 813 F.2d 1327, 1329-30 (4th Cir. 1987)) (holding that downturn in market was foreseeable and thus outside the scope of "catch-all" force majeure clause); *Great Lakes Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, 871 F. Supp. 2d 843, 852-53 (D. Minn. 2012) (collecting authorities from four jurisdictions, three of which held that the 2008 financial crisis did not constitute a force majeure, and one concluding that it did under force majeure clause which "specifically included 'change to economic conditions' as an enumerated event that could excuse a default").

At most, the Rexings demonstrate that they subjectively believed that demand for cage-free eggs would remain above a certain, undefined level. And the parties' precontract negotiations, to which both parties cite, likewise cuts in Rembrandt's favor. Dylan's proposed "clause for use [sic] to get out of this contract based on poor performance" was ultimately omitted from the final

draft.  [Filing No. 72-10 at 1 (email from Dylan dated August 23, 2016 ).]  As the cases cited in *Great Lakes* demonstrate, parties are free to contract to allow for excusal where economic circumstances dictate.  And as with the excess loss credits provision, the parties had every opportunity to negotiate for a force majeure clause that would excuse performance if demand for cage-free eggs dropped.  They did not do so, and no evidence suggests that an unreasonably anticipatable event led to the alleged drop in demand.  Rexing's performance was therefore not excused under the force majeure clause of paragraph O of the purchase agreement.

### 2.  Commercial Impracticability and Frustration

Rexing's argument that continued performance of the purchase agreement was excused due to commercial impracticability or frustration fails for much the same reason that its force majeure argument fails.  As Rexing explains, the Iowa Supreme Court has said that a buyer may be "excused for nonperformance 'if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." *Nora Springs Co-op. Co. v. Brandau*, 247 N.W.2d 744, 748 (Iowa 1976) (quoting Iowa Code § 554.2615(1)).  But *Nora Springs*, the primary case upon which Rexing relies and from which it selectively quotes, definitively undermines Rexing's impracticability theory.  Though a party is "not required to prove impossibility in order to excuse performance," "the mere fact that performance becomes economically burdensome does not excuse performance unless the increased cost is due to **some unforeseen contingency** which alters the essential nature of the performance." *Id.* at 747-48 (emphasis added).  The only evidence Rexing has put forth is that demand dropped, such that it was having a difficult time selling eggs at a profit.  No evidence suggests that this drop in demand was due to an "unforeseen contingency" or that the drop

"alter[ed] the essential nature" of its contractual performance. Rexing's evidentiary showing is insufficient as a matter of law to invoke the impracticality excuse of section 554.2615(1).

Moreover, Rexing sets forth no evidence whatsoever to support its alternative argument that the egg quality deficiencies played any role in frustrating its ability to comply with the purchase agreement. Indeed, this argument suggests that Rexing was not receiving enough Grade A eggs to sell, when Rexing simultaneously argues that it had too many eggs that it was unable to sell due to the drop in demand. This argument therefore fails as logically inconsistent with Rexing's position that it lacked buyers for its eggs and wholly unsupported by the evidence.[8]

### 3. Conclusion

In summary, no genuine dispute of fact exists as to whether Rexing's performance was excused, either under the force majeure clause or pursuant to the UCC's provisions on commercial impracticability. Rembrandt is therefore entitled both to summary judgment on Rexing's claim for a declaratory judgment that its performance was excused and to partial summary judgment on its own claim as to Rexing's breach of the purchase agreement by refusing to accept loads it was obligated to purchase.

### D. Rembrandt's Damages

That Rexing's breach has been conclusively established by the undisputed evidence does not end the matter, however. Rembrandt also argues that no genuine issue of material fact exists

---

[8] Additionally, though Rexing does not argue this point, Rexing would not be entitled to the equitable remedy of rescission, under which "(1) the injured party must not be in default, (2) the breach must be substantial and go to the heart of the contract, and (3) remedies at law must be inadequate." *Clark v. McDaniel*, 546 N.W.2d 590, 595 (Iowa 1996). In this case, Rexing was in default by underpaying for previously-accepted loads, and no evidence suggests that any breach reached the "heart of the contract." As explained above, the heart of the contract was Rembrandt's promise to provide merchantable, cage-free white eggs and excess credits for when loads did not grade out at or above 91.5 percent Grade A. Rexing has offered no evidence to suggest that Rembrandt did not perform as promised.

as to the damages it is owed for Rexing's breach. [Filing No. 81 at 29-32.] In total, Rembrandt argues that Rexing owes $1,725,523.29 in addition to attorney's fees due to its breaches of the purchase agreement. [Filing No. 81 at 29-32.] This includes $1,665,463.38 for eggs following Rexing's repudiation, which is in part based upon the difference between the contract price and the private resale price for 133 of the 198 truckloads, and the difference between the contract price and the market price as to the remaining 65 loads. [See Filing No. 81 at 18.] Rexing argues that the other $60,059.91 represents the amount Rembrandt claims Rexing underpaid for loads it accepted. [Filing No. 81 at 31.]

In response, Rexing argues that many genuine issues of material fact exist precluding summary judgment on damages. First, Rexing argues that Rembrandt resold goods that are neither identified in nor related to the purchase agreement, particularly regarding non-Tipton eggs that were sold after repudiation. [Filing No. 90 at 25-28.] Second, relying upon James Woods's expert opinion, Rexing argues that Rembrandt resold too many eggs per load. [Filing No. 90 at 28.] Third, again relying upon Dr. Woods's opinion, Rexing argues that Rembrandt sold too many loads per week and cannot resell more in a given week than it would have sold to Rexing. [Filing No. 90 at 28.] Fourth, Rexing challenges Rembrandt's method for calculating damages based upon loads where Rembrandt used the eggs by processing them for liquid and powdered products. [Filing No. 90 at 28-29.] Fifth, Rexing argues that Rembrandt actually increased production at the Tipton farms to increase its damages, despite knowing that Rexing would not purchase any additional eggs. [Filing No. 90 at 29.] Sixth, Rexing argues that Rembrandt's damages were not foreseeable. [Filing No. 90 at 29-30.] Finally, Rexing argues that Rembrandt failed to provide notice of its intent to resell the egg loads through private sales. [Filing No. 90 at 30-31.]

In reply, Rembrandt argues that Dr. Woods rendered unqualified, erroneous, and unexplained opinions. [Filing No. 99 at 18-22.] Rembrandt also argues that its use of 65 loads of eggs for processed products was commercially reasonable. [Filing No. 99 at 22.] Rembrandt argues that it provided ample notice of its intent to engage in private resale of the remaining eggs. [Filing No. 99 at 17-18.] Finally, Rembrandt again points out that Rexing does not dispute that it owes $60,069.61 for the loads Rexing accepted but failed to pay for in full. [Filing No. 99 at 23.]

In surreply, Rexing again argues that Rembrandt could not substitute non-Tipton eggs for resale purposes. [Filing No. 102 at 5-7.] Additionally, Rexing argues that Rembrandt frontloaded its resales, such that more loads were sold when market prices were low and fewer were sold when market prices were higher. [Filing No. 102 at 7-8.] Finally, Rexing again takes issue with Rembrandt using certain resale loads for its own processed product needs, arguing that Rembrandt failed to credit Rexing for any saved costs nor supports its claimed "market price" for those loads it did not resell. [Filing No. 102 at 9-10.] In total, Rexing argues that Rembrandt's request for damages is speculative. [Filing No. 102 at 11.]

Iowa's UCC provides an "aggrieved seller" with a number of remedies where a buyer repudiates a contract. Iowa Code § 554.2703. As relevant here, a seller may "resell the goods concerned or the undelivered balance thereof," id. § 554.2706, or may recover the "difference between the market price . . . and the unpaid contract together with any incidental damages . . . , but less expenses saved in consequence," id. § 554.2708. As the UCC comment to section 554.2703 explains, "the remedies are essentially cumulative in nature . . . . Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case." Id. § 554.2703 UCC cmt. 1.

The resale remedy, which Rembrandt seeks with respect to the 133 loads resold to other buyers, provides that "[w]here the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages . . . , but less expenses saved in consequence of the buyer's breach." *Id.* § 554.2706(1). Private resales are permitted where the seller "give[s] the buyer reasonable notification of the seller's intention to resell," *id.* § 554.2706(2), and the purpose of the resale is to fix the seller's damages, *see id.* UCC cmt. 2. "The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." *Id.* The prevailing rule— Rexing did not cite any cases to the contrary, and the Court could not locate any—is that,

> [i]n the case of fungible goods, [the UCC] does not necessarily require that the resold goods be the exact goods that were refused by the buyer, but the resale must nevertheless be reasonably identified to the broken contract, and . . . the reasonableness of identification and of resale must be determined by examining whether the market value of, and price received for, the resold goods accurately reflect the market value of the goods which were the subject of the contract.

Need for Identification of Resold Goods to Broken Contract, 24 Williston on Contracts § 66:33 (4th ed. 2004) (collecting authorities); *e.g.*, *Firwood Mfg. Co., Inc. v. Gen. Tire, Inc.*, 96 F.3d 163, 168 (6th Cir. 1996) ("[S]ellers [may] substitute fungible goods for purposes of resale so long as the goods truly are fungible and the resale itself is commercially reasonable."). Timing of the sale is a primary consideration in commercial reasonableness, *see, e.g.*, *Firwood Mfg.*, 96 F.3d at 168-69, but it is not the only one. The UCC comment to section 554.2704, a provision related to, though different from, the resale remedy provision in section 557.2706, suggests that more general principles of damages mitigation have a role to play in assessing commercial reasonableness:

> Under [the sales article], the seller is given express power to complete manufacture or procurement of goods for the contract unless the exercise of reasonable commercial judgment as to the facts as they appear at the time he learns of the

breach makes it clear that such action will result in a material increase in damages. The burden is on the buyer to show the commercially unreasonable nature of the seller's action in completing manufacture.

Iowa Code 554.2704 UCC cmt. 2.

The Court may be brief in its assessment of the parties' myriad arguments on damages because Rembrandt falls far short of establishing the amount of its damages as a matter of law. Beginning with the resold loads, summary judgment is inappropriate because "[w]hat is commercially reasonable is a question of fact," which must, in the ordinary course, be reserved for the jury to decide. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) (applying Wisconsin's UCC); *Knierim v. First State Bank*, 488 N.W.2d 454, 457 (Iowa Ct. App. 1992) ("The commercial reasonableness of the sale is a question of fact . . . .") (interpreting "commercial reasonableness" in article 9 of Iowa's UCC); Requirements of Good Faith and Commercial Reasonableness in Manner of Resale, 24 Williston on Contracts § 66:32 (4th ed. 2004) ("Generally, whether or not a resale has been made in a commercially reasonable manner is a question of fact for the jury, or other trier of facts, under all of the facts and circumstances . . . ."). The seller bears the burden of establishing commercial reasonableness. *See John Deere Leasing Co. v. Fraker*, 395 N.W.2d 885, 887 (Iowa 1986) (interpreting "commercial reasonableness" in article 9 of Iowa's UCC); 24 Williston on Contracts § 66:32. And while the absence of an issue of material fact regarding commercial reasonableness may, under certain circumstances, warrant summary judgment, *see, e.g.*, *Gen. Elec. Capital Corp. v. FPL Serv. Corp.*, 986 F. Supp. 2d 1029, 1041 (N.D. Iowa 2013) ("I note, however, that if GECC had offered admissible evidence supporting Tyler's affidavit, I would likely conclude that GECC's sale of the copiers was commercially reasonable as a matter of law."), that is not the case where competing inferences may be drawn from even largely undisputed background facts, *see, e.g.*, *John Deere*

*Leasing*, 395 N.W.2d at 888 ("On this summary judgment record, considering all the elements of this private sale as an aggregate, a finder of fact could reasonably conclude that the price Deere received for the combine was grossly inadequate, the timing of the sale inappropriate, and consequently that Deere had not satisfied those burdens on the question of commercial reasonableness.").

In this case, Rexing has poked significant holes in Rembrandt's proffer which preclude summary judgment on the issue of commercial reasonableness, even setting to one side for present purposes Dr. Woods's contested opinions. As Rexing points out, Rembrandt's own record of resales indicates that Rembrandt resold considerably more loads in June and July, when they were able to fetch prices of around $0.37 to $0.40 per dozen compared to later during the summer and early fall, when loads were resold at prices from $0.48 to over $1.00 per dozen. [*See* Filing No. 72-5.] Rembrandt explains that it did not resell eggs according to the 12 loads per week schedule agreed upon with Rexing because it was not always able to find buyers for the eggs. But that explanation is one for the jury to assess. An additional issue involves credits for the quality of eggs. While the Court disagrees with Rexing that the Purchase Agreement permits egg quality issues to excuse its continued performance, it is unclear whether the price Rembrandt charged Rexing for the resold eggs provided Rexing with any credits to the extent the loads fell below 91.5 percent Grade A. And finally, Rexing points to evidence suggesting that Rembrandt re-operationalized the Tipton farms despite knowing that Rexing would no longer purchase any additional eggs. That decision also casts substantial doubt on the commercial reasonableness of Rembrandt's post-repudiation resales and whether Rembrandt may have intentionally augmented its damages. These, as well as any other arguments regarding commercial reasonableness, must be resolved by the jury at trial.

While the Court concludes that Rembrandt is not entitled to summary judgment as to commercial reasonableness, and therefore need not address all of Rexing's arguments, it notes that summary judgment is not defeated merely because Rembrandt elected to source some loads from outside of Tipton. The parties expend significant energy clucking about whether Tipton eggs were specified in the purchase agreement. But for purposes of Rembrandt's resale remedy, the case law establishes that fungible goods such as cage-free white eggs may be substituted as long as they are reasonably identified to the contract. Reasonable identification to the contract looks to the type and quality of the goods, and Rexing makes no argument that the eggs sourced from outside Tipton were any different from the Tipton eggs. Therefore, Rembrandt was not precluded from substituting loads from other sources to calculate its damages pursuant to that remedy election, though whether the sales were commercially reasonable; whether Rembrandt's damages calculations properly accounted for "expenses saved in consequence of the buyer's breach," Iowa Code § 554.2706(1); and whether Rexing was properly credited to the extent the resold loads fell beneath the threshold quality level remain at issue for trial.

Turning, then, to Rembrandt's decision to use 65 loads for its own processed egg needs, the Court again concludes that fact questions remain for the jury to decide. As an initial matter, however, because UCC remedies are cumulative and not exclusive, Rembrandt was free to choose to resell some loads and select another remedy—here, market value, insofar as the Court can discern—for others. Iowa Code § 554.2703 UCC cmt. 1. Iowa's UCC states that "any damages based on market price . . . shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation." Iowa Code § 554.2723(1). But Rembrandt fails to establish the market rate as a matter of law. All Rembrandt's evidence says is that "[t]he prices of the eggs charged to the Rexings for these 65 loads were the actual market

prices at which Rembrandt was able to sell loads to third parties at the same time." [Filing No. 78 at 53.] That showing is deficient and falls far short of the evidence required to establish the "price of such goods prevailing at the [relevant] time." Additionally, Rembrandt again fails to establish that its damages calculations for those loads credit Rexing for any "expenses saved in consequence of the buyer's breach." Iowa Code § 554.2708(1).

In short, Rembrandt's proof as to its damages claimed is soft-boiled. It has not remotely met its burden to establish that it is entitled to judgment as a matter of law as to its damages for Rexing's repudiation. Significant issues of fact require jury determination. Rexing does not, however, controvert Rembrandt's claim for $60,069.61 for loads that Rexing accepted but underpaid. Rembrandt is entitled to summary judgment as to that sum.

## V.
### CONCLUSION

Having unscrambled the veritable frittata presented by Rembrandt's Motion for Summary Judgment [71], the Court rules as follows:

- The Court **GRANTS** the Motion as to Rexing's claims. Rexing's claim for damages based upon Rembrandt's breach of the location provision fails as a matter of law. The limitation of damages provisions do not fail of their essential purpose, and they therefore preclude Rexing's claims for damages based upon the quality of the egg loads. Rexing's continued performance was not excused, and Rexing's claim for declaratory judgment therefore also fails.

- The Court **GRANTS** the Motion as to liability for Rembrandt's breach of contract claim. Rexing's repudiation was a breach of the purchase agreement.

- The Court **DENIES** the Motion as to the damages Rembrandt requests for Rexing's repudiation, which must be decided by a jury, but **GRANTS** the Motion as to the $60,069.61 Rexing underpaid for loads it accepted.

- Rembrandt did not move for summary judgment on "Count II—Breach of Credit Agreement" of its Amended Counterclaim, [Filing No. 15 at 5], which therefore remains pending.

- Rembrandt did not respond to Rexing's arguments that Dylan may not be held individually liable because he was not a partner in Rexing Quality Eggs. Pursuant to Federal Rule of Civil Procedure 56(f), the Court **ORDERS** Rembrandt to show cause, on or before **January 11, 2019**, why it should not grant summary judgment in Dylan Rexing's favor as to Rembrandt's breach of contract claim against him.

The Court requests that the Magistrate Judge confer with the parties at his earliest convenience to attempt to mediate a negotiated resolution to this matter.

Date: 12/21/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**