UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| REXING QUALITY EGGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| REMBRANDT ENTERPRISES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) No. 3:17-cv-00141-JMS-MPB |
| REMBRANDT ENTERPRISES, INC., | ) |
| | ) |
| Counterclaim Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| REXING QUALITY EGGS, JOSEPH L. REXING, LEO R. REXING, and DYLAN REXING, | ) |
| | ) |
| Counterclaim Defendants. | ) |

## **ORDER**

On November 19, 2019, the trial in this matter concluded, and the jury returned a verdict for Defendant-Counterclaimant Rembrandt Enterprises, Inc. ("Rembrandt"), and against Counter Defendants Rexing Quality Eggs, Leo R. Rexing, Dylan Rexing, and Joseph L. Rexing (collectively, "the Rexings")[1] in the amount of $1,462,233. [Filing No. 210.] Rembrandt filed a

---

[1] In the interest of clarity, "Rexing Quality Eggs" refers only to the entity. "The Rexing Individuals" refers only to Leo R. Rexing, Dylan Rexing, and Joseph L. Rexing. "The Rexings" includes Rexing Quality Eggs as well as the Rexing Individuals.

1

Motion for Reasonable Attorneys' Fees, Prejudgment Interest, and Costs pursuant to the contract under which the lawsuit was brought, [Filing No. 216], and the parties briefed the issue, [Filing No. 217; Filing No. 222; Filing No. 232]. Following supplemental briefing on the applicability and impact of Iowa Code § 535.5, [Filing No. 243], Rembrandt's motion is ripe for the Court's decision.

# I.
## PREJUDGMENT INTEREST

### A. Standard of Review

In diversity actions, federal courts look to state law to determine the availability and propriety of prejudgment interest. *Travelers Ins. Co. v. Transp. Ins. Co.*, 846 F.2d 1048, 1051 (7th Cir. 1988). Under Iowa law,[2] "[i]nterest shall be allowed on all money due on judgments and decrees of courts at a rate calculated according to section 668.13." Iowa Code § 535.3. Iowa Code section 668.13 provides that "[i]f the interest rate is fixed by a contract on which the judgment or decree is rendered, the interest allowed shall be at the rate expressed in the contract, not exceeding the maximum rate permitted under 535.2."

### B. Background

The procedural history between the parties is extensive. The litigation stems from the Agreement, pursuant to which Rexing Quality Eggs agreed to purchase from Rembrandt twelve loads of eggs per week. [Filing No. 1-1 at 9.] Rexing Quality Eggs refused to fulfill its obligations under the contract, sparking litigation.

---

[2] Paragraph L of the parties' Purchase Agreement (the "Agreement") reads "**Governing Law**: This Agreement shall be governed by and construed under the laws of the State of Iowa." [Filing No. 1-1 at 10.]

On August 11, 2017, Rembrandt filed the first lawsuit based on the Agreement in Iowa state court. [*See* Filing No. 1-2 in Case No. 5:17-cv-4051-LTS-CJW.] On September 11, 2017, the Rexings removed the case to the Northern District of Iowa (the "N.D. Iowa Case"). [Filing No. 1 in Case No. 5:17-cv-4051-LTS-CJW.] The N.D. Iowa Case was ultimately dismissed without prejudice on October 2, 2017, pursuant to a stipulation of dismissal. [Filing No. 11 in Case No. 5:17-cv-4051-LTS-CJW.]

Rexing Quality Eggs filed this lawsuit on August 16, 2017 in Vanderburgh County, Indiana, [Filing No. 1-1], and on September 8, 2017, Rembrandt removed the action to this Court, [Filing No. 1]. On October 6, 2017, Rembrandt filed its Answer to Rexing Quality Eggs' Complaint, and asserted Counterclaims against Rexing Quality Eggs and the Rexing Individuals. [Filing No. 9.]

On January 29, 2019, Rexing Quality Eggs filed another lawsuit in Vanderburgh County, Indiana ("*Rexing II*"). [Filing No. 1-3 in Case No. 3:19-cv-00031-JMS-MPB.] On February 14, 2019, Rembrandt removed that case to this Court. [Filing No. 1 in Case No. 3:19-cv-00031-JMS-MPB.] Rembrandt then filed a Motion to Dismiss *Rexing II*, [Filing No. 20 in Case No. 3:19-cv-00031-JMS-MPB], which the Court granted, [Filing No. 31 in Case No. 3:19-cv-00031-JMS-MPB]. Final judgment was entered on May 29, 2019, [Filing No. 32 in Case No. 3:19-cv-00031-JMS-MPB].[3]

In the present litigation, Rembrandt previously moved for summary judgment, [Filing No. 71], which the Court granted in part, [Filing No. 110]. Specifically, the Court granted Rembrandt's motion as to Rexing Quality Eggs' claims, as to liability only on Rembrandt's breach of contract

---

[3] This Court's judgment was recently affirmed by the Seventh Circuit Court of Appeals, though a mandate has not yet issued.

claim, and as to Rembrandt's claim for $60,069.61 for loads that the Rexings accepted, but for which they underpaid.  [Filing No. 110 at 42-43.]

The issue of damages for Rembrandt's breach of contract claim proceeded to trial in November 2019, and the jury awarded Rembrandt $1,462,233 in damages.  [Filing No. 206.] Based on the jury's verdict and damages award, together with the Court's earlier summary judgment ruling, the Court entered final judgment in favor of Rembrandt in the amount of $1,522,302.61.  [Filing No. 210.]  After judgment was entered, Rembrandt filed a Motion for Reasonable Attorneys' Fees, Prejudgment Interest, and Costs.  [Filing No. 216.]  That motion is now ripe for the Court's review.

**C. Discussion**

Under "Payment," Paragraph E of the Agreement provides that

> Payment terms are Net 21 days from invoice date.  Failure of Purchaser to pay any past due invoice shall give Rembrandt the right to suspend future shipments until previous shipments are paid for, and/or, at the option of Rembrandt, to terminate this Agreement by giving written notice thereof to Purchaser.  Past due invoices shall be subject to an interest charge of one (1%) per month.

[Filing No. 1-1 at 9.]  Pursuant to this provision and the 1% rate of interest contained therein, Rembrandt seeks $420,798.39 in prejudgment interest.  [Filing No. 217 at 12-13.]

1. *Iowa law on interest rates*

The Iowa statutes concerning interest rates are complex.  To start, section 668.13 of the Iowa Code provides that "[i]f the interest rate is fixed by a contract on which [a] judgment or decree is rendered, the interest allowed shall be at the rate expressed in the contract, not exceeding the maximum rate permitted under 535.2."  Therefore, Iowa Code § 535.2(3)(a)(1) describes the method for calculating the maximum interest rate that may be lawfully included in a contract. Under § 535.2(3)(a)(1):

4

> [t]he maximum lawful rate of interest which may be provided for in any written agreement for the payment of interest . . . shall be two percentage points above the monthly average ten-year constant maturity interest rate of United States government notes and bonds . . . for the calendar month second preceding the month during which the maximum rate based thereon will be effective, rounded to the nearest one-fourth of one percent per year.

The Iowa Administrative Bulletin posts the usury rates for each month, and the usury rate for October 2016—the month the parties entered into the Agreement—was 3.50%. IAB Vol. XXXIX, No. 9, (10/26/16), p. 746.

Section 535.4 states that "[n]o person shall, directly or indirectly, receive in money or in any other thing, or in any manner, any greater sum or value for the loan of money, or upon contract founded upon any sale or loan of real or personal property, than is in this chapter prescribed." Iowa Code § 535.4. In other words, § 535.4 declares usurious any interest rate that exceeds the maximum interest rate described in § 535.2(3)(a)(1). Section 535.5 then explains the penalties for seeking to enforce a usurious interest rate. That section provides:

> If it is ascertained in an action brought on a contract that a rate of interest has been contracted for, directly or indirectly, in money or in property, greater than is authorized by this chapter, the rate shall work a forfeiture of eight cents on the hundred by the year upon the amount of the principal remaining unpaid upon the contract at the time judgment is rendered, and the court shall enter final judgment in favor of the plaintiff and against the defendant for the principal sum remaining unpaid without costs, and also against the defendant and in favor of the state, to be paid to the treasurer of state for deposit in the general fund of the state, for the amount of the forfeiture. If unlawful interest is contracted for the plaintiff shall not have judgment for more than the principal sum, whether the unlawful interest is incorporated with the principal or not.

Iowa Code § 535.5. A party who brings an action seeking to enforce a usurious interest rate shall not be entitled to judgment for more than the unpaid principal amount, meaning the party cannot recover prejudgment interest, costs, or attorneys' fees. *Id.*; *Muchmore Equipment, Inc. v. Grover,*

315 N.W.2d 92, 99-100 (Iowa 1982).[4] Additionally, the party against whom the action is brought must pay a forfeiture to the treasurer of the state in the amount of "eight cents on the hundred by the year" upon the principal remaining unpaid at the time of the judgment. *Id.*

All that said, § 535.2(2)(a) articulates a number of exceptions. [Filing No. 247 at 1-2.] A person meeting any of the exceptions may agree to pay any rate of interest, and that person may not thereafter plead or assert a usury defense. Iowa Code § 535.2(2)(a). Additionally, the person agreeing to receive the interest is not subject to any penalty or forfeiture for so doing. *Id.* One such exception is the so-called "Business Credit Exception." Iowa Code § 535.2(2)(a)(5). The Business Credit Exception covers "[a] person borrowing money or obtaining credit for business or agricultural purposes."[5] *Id.* Rembrandt seeks to rely on this exception in enforcing the interest rate in the Agreement.

   *2. Parties' Arguments*

At the outset, the parties appear to agree that the contracted 1% per month interest rate exceeds the 3.50% per year maximum rate set by § 535.2(3)(a)(1). [*See* Filing No. 217 at 11-13; Filing No. 222 at 16-17.] Indeed, the Iowa Supreme Court has held that it does. In *Muchmore Equipment, Inc.*, 315 N.W.2d 92, the Iowa Supreme Court held that a 1% per month interest rate

---

[4] As Rembrandt correctly points out, a 1982 amendment to § 535.5 prospectively changed the result in *Muchmore*. [Filing No. 247 at 4 (citing *Power Equipment, Inc. v. Tschiggfrie*, 460 N.W.2d 861, 863 (Iowa 1990)).] However, that amendment did not change that § 535.5, when applicable, prohibits a plaintiff from recovering attorneys' fees and costs.

[5] It is undisputed here that the relevant transaction was for a business and/or agricultural purpose. [Filing No. 222 at 17.] The Code defines "business purpose" to include a "a commercial, service, or industrial enterprise carried on for profit and an investment activity." Iowa Code § 535.2(2)(a)(5). "Agricultural purpose" is defined as "a purpose related to the production, harvest, exhibition, marketing, transportation, processing, or manufacture of agricultural products by a person who cultivates, plants, propagates, or nurtures the agricultural products." Iowa Code § 535.13.

6

"in the contract exceeded the rate allowed by chapter 535," which, at the time, was 10.25% per year. 315 N.W.2d at 98. Rembrandt contends that the contracted 1% per month interest rate is nevertheless lawful because the Agreement "is exempted under Iowa Code § [535.2(2)(a)(5)]." [Filing No. 217 at 13.] Rembrandt also notes that the parties entered into a "Credit Agreement," which it contends shows that the Rexings "clearly 'obtained credit' from Rembrandt." [Filing No. 217 at 12.]

The Rexings respond by arguing that Rembrandt is actually "seeking finance charges under Iowa Code § 535.11." [Filing No. 222 at 13.] They argue that Rembrandt's judgment was based on its breach of contract claim, not on the Credit Application.[6] [Filing No. 222 at 14.] Additionally, they argue, "Rembrandt's judgment and its entitlement to prejudgment interest does not arise from 'past due invoices' as stated in Paragraph E of the Agreement but from Iowa's version of the Uniform Commercial Code (UCC)." [Filing No. 222 at 14.] The Rexings argue that "Iowa courts have specifically applied the general prejudgment interest statute on 'judgments and decrees' under Iowa Code § 535.3 to seller's damages under the UCC for breach of an express contract." [Filing No. 222 at 15.] The Rexings also dispute that the Business Credit Exception applies to this case. [Filing No. 222 at 16-17.] Though they concede that the contract at issue was for a business purpose, they contend that the exception does not apply because: (1) Rembrandt's judgment "does not result from a loan to the Rexings or from credit provided to the Rexings[, but instead] from the Rexings' failure to purchase contracted-for-goods"; (2) Rembrandt's damages result from application of the Iowa UCC; and (3) "no authority appl[ies] Iowa Code § 535.2(2)(a)(5) to a judgment relating to the sale of goods." [Filing No. 222 at 17.] The Rexings

---

[6] This document, [Filing No. 15-1], called a "Credit Agreement" by Rembrandt and a "Credit Application" by the Rexings, is discussed more fully below. The Court will refer to this document as the "Credit Application," because that is the title that appears on the document itself.

therefore contend that "[t]he Court should award Rembrandt prejudgment interest under Iowa Code §§ 535.3(1) and 668.13 in the total amount of **$122,100.35**." [Filing No. 222 at 17 (emphasis in original).]

Rembrandt replies that "[t]here is no question that Paragraph E controls prejudgment interest in this case and replaces the default rate of interest under Iowa law." [Filing No. 232 at 14.] Rembrandt maintains that the Business Credit Exception under § 535.2(2)(a)(5) applies, and therefore the Rexings "may not plead or interpose the claim or defense of usury" in this case. [Filing No. 232 at 15 (quoting Iowa Code § 535.2(2)(a)).] If the Business Credit Exception does not apply, Rembrandt argues that "the applicable interest rate would still be 5% under Section 535.2(1)." [Filing No. 232 at 17.] It argues that "[u]nder 535.2(1), contract interest is capped at 5% unless an exception applies under Section 535.2(2). The exception that applies here is the exception for the provision of credit for business purposes under Section [535.2(2)(a)(5)] as set forth above." [Filing No. 232 at 17.]

Responding to the Court's inquiry regarding the effect of § 535.5, Rembrandt argues that the legislative history of the usury statute makes clear that the "Iowa legislature plainly intended to exempt all written agreements motivated by a business purpose . . . from the restrictions of the usury statute not only by prohibiting the 'borrowers' in such transactions from even asserting a usury defense, but also by insulating the 'lenders' in such transactions from any of the usury statute's forfeiture provisions or other limitations." [Filing No. 247 at 3.] In support of that argument, Rembrandt notes that on at least two occasions, the Iowa Supreme Court has applied the Business Credit Exception to cases involving contracts for the sale of goods. [Filing No. 247 at 4-5 (citing *Power Equipment, Inc. v. Tschiggfrie*, 460 N.W.2d 861 (Iowa 1990); *C&J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65 (Iowa 2011)).] Therefore, Rembrandt argues, it does not

matter that the contract was for the sale of goods; "because the Rexings admittedly entered the agreement for a business purpose, the agreement cannot be the subject of a usury defense and Rembrandt is therefore 'not subject to' Section 535.5." [Filing No. 247 at 5.]

Finally, responding to both the Court's inquiry and Rembrandt's arguments, the Rexings argue that Rembrandt seeks usurious prejudgment interest. [Filing No. 249 at 2.] The Rexings also argue that "nothing in § 535.2 abrogates application of § 535.5." [Filing No. 249 at 4.]

   *3. Analysis*

In this case, it is clear and undisputed that the 1% per month rate contained in the Agreement exceeds the maximum lawful rate of 3.50% per year. *See* Iowa Code § 535.2(3)(a)(1); IAB Vol. XXXIX, No. 9, (10/26/16), p. 746. Therefore, the Court must determine whether the Rexings were "person[s] borrowing money or obtaining credit for business or agricultural purposes," Iowa Code § 535.2(2)(a)(5), or whether § 535.5 applies and bars recovery of prejudgment interest, as well as attorneys' fees and costs.[7]

Turning first to the Credit Application, [Filing No. 15-1], the parties frequently mention this document in their briefs. Rembrandt argues that "pursuant to the Credit [Application], [the Rexings] clearly 'obtained credit' from Rembrandt." [Filing No. 217 at 12.] This does not control the Court's decision on Rembrandt's motion for several reasons. First, the Credit Application was not the subject of this litigation. Rembrandt explicitly dropped its claim for breach of the Credit

---

[7] Rembrandt asserts that if the Business Credit Exception does not apply, the 5% default rate under § 535.2(1) would control. [Filing No. 232 at 17.] However, § 535.2(1) applies where no contract provides otherwise. Where a contract contains an interest rate, the rate must be below the maximum rate, or the contract must fit within an exception. If the interest rate is above the maximum rate and not within an exception, then § 535.5 applies if a person brings an action based on that contract. Rembrandt cannot avoid the penalties of § 535.5 by seeking the default 5% interest rate after contracting for and seeking a usurious one.

Application prior to trial, and the jury's verdict was not based on that claim. [Filing No. 180 at 50.] Additionally, the Credit Application was signed August 30, 2016—days before the Agreement was executed, [Filing No. 1-1 at 11; Filing No. 15-1 at 3], and the Agreement contains an integration clause, calling into question the legal effect of the Credit Application in any event. The Credit Application also contains additional terms not found in the Agreement, as well as terms that contradict the Agreement. [*Compare* the Agreement, Filing No. 1-1 at 9 (setting payment terms at 21 days and interest rate at 1%), *with* the Credit Application, Filing No. 15-1 at 3 (setting payment terms at 14 days and interest rate at 1.5%).]

Turning back to the relevant Agreement, Rembrandt directs the Court to two cases that it believes show the Agreement was one that fits within the Business Credit Exception: *Tschiggfrie*, 460 N.W.2d 861; and *Wolfe*, 795 N.W.2d 65. In *Tschiggfrie*, for several years, Mr. Tschiggfrie purchased parts and services from Power Equipment for use in his excavating business. 460 N.W.2d at 862. The purchases were made on credit. *Id.* Mr. Tschiggfrie's employees picked up equipment at Power Equipment's place of business and signed an invoice form which stated that, in consideration for the granting of credit, Mr. Tschiggfrie agreed to pay a specified finance charge if the prices stated in the invoices were not paid within thirty days. *Id.* The Iowa Supreme Court held that the "law permits a section 535.2(2)(a)(5) agreement with respect to the type of transactions involved in the present dispute."[8] *Tschiggfrie*, 460 N.W.2d at 863.

In *Wolfe*, Lake McBride Golf Course was approached by Royal Links, an advertising company, about leasing a beverage cart. 795 N.W.2d at 70-71. Eventually, Lake McBride entered into a sort of tripartite arrangement to lease a beverage cart. *Id.* Lake McBride agreed to lease a

---

[8] The court in *Tschiggfrie* ultimately remanded the case back to the state court to resolve the factual dispute concerning whether the signed invoices constituted a signed writing within the meaning of the statute. *Tschiggfrie*, 460 N.W.2d at 864.

beverage cart from C&J Leasing for sixty monthly payments of $299 from Lake McBride to C&J Leasing. *Id.* Lake McBride also agreed to permit Royal Links to display advertising on the beverage cart in exchange for sixty monthly payments of $299 from Royal Links to Lake McBride. *Id.* Additionally, the lease agreement provided that at the conclusion of the lease, Lake McBride had the option to purchase the beverage cart for $1.00, provided the lease terms were satisfied. *Id.* Thus, from Lake McBride's perspective, it was able to lease, and eventually acquire, a beverage cart at no cost (other than allowing advertising on the cart) because the amount it paid for the cart was equal to the amount it received for allowing advertising. *Id.* The Iowa Supreme Court noted that "[t]he beverage carts were used in connection with the golf course operations and its use came within the goals of the business-purpose exception contained in section 535.2(2)(a)(5)." *Id.* at 82. Therefore, the court found that "Lake McBride could agree to pay any rate of interest and [could not] assert a usury defense because the lease agreement was for a 'business purpose.'" *Id.*

While the two cases above are factually similar to this one in some respects, they are nevertheless distinguishable. Turning first to *Wolfe*, the transaction in that case was a "sale with a security interest" disguised as a lease. *Id.* at 75. In effect, Lake McBride agreed to pay the monthly $299 in exchange for the use and eventual ownership of the beverage cart. As such, the transaction fell within the business credit exception: For the monthly payments, it obtained possession and use of the beverage cart, and also the option to become the owner of the beverage cart for nominal consideration. Lake McBride received the full value of the contract—the $12,500 beverage cart—immediately, and it agreed to pay for that value in monthly installments over the course of several years.

In this case, while the Rexings agreed to make periodic payments, those payments corresponded to their receipt of the eggs. Unlike Lake McBride, the Rexings did not receive the

11

full value of the contract—624 loads of eggs—immediately. Instead, they would receive twelve loads of eggs per week. As the eggs came in, and after a reconciliation process concerning egg quality discussed below, only then were the Rexings obligated to pay the invoiced amount.

Turning next to *Tschiggfrie*, Mr. Tschiggfrie had purchased parts and services from Power Equipment for several years, and the opinion does not indicate any disagreements over the prices charged for the items or services. *Tschiggfrie*, 460 N.W.2d at 862. Upon picking up the items that had been purchased from or serviced at Power Equipment's place of business, Mr. Tschiggfrie's employees signed invoices stating that Mr. Tschiggfrie agreed to pay specified finance charges if the prices stated in the invoice were not paid within thirty days. *Id.* There is no indication that payment was based on the use of the items or the quality of the items.

While somewhat similar to the signed invoices in *Tschiggfrie*, the logistics of the transaction and payments in this case are significantly different. The Agreement states that "[p]ayment terms are *Net 21 days* from invoice date," and "[p]ast due invoices shall be subject to an interest charge of one percent (1%) per month." [Filing No. 1-1 at 9 (emphasis added).] The Agreement also provides that "[a]ll Shell Eggs hereunder shall be inspected within *ten (10) business* days of receipt by Purchaser at the Purchaser's Rosebud, AR, facility, and Purchaser shall be obligated to notify Rembrandt, in writing, within such *ten (10) business* day period of any failure to conform with the specifications and requirements herein." [Filing No. 1-1 at 12 (emphasis added).] The Agreement further provided for a reduction in price if a certain percentage of the eggs did not "grade out as Grade A." [Filing No. 1-1 at 12.] Thus, the price of a particular shipment of eggs depended in part on the quality of the eggs. The Rexings were given ten business days—which is at least twelve actual days—in which to inspect and grade the eggs, and communicate in writing if the eggs failed to conform to the Agreement's specifications.

12

Consequently, the actual price of a shipment might not be known until twelve days (or later, depending on calculations and communications with Rembrandt)[9] after the Rexings received the eggs and, presumably, the corresponding invoice.[10]

Therefore, the 21-day time period is not analogous to the 30-day period in *Tschiggfrie*. In *Tschiggfrie*, the arrangement simply gave Mr. Tschiggfrie a 30-day interest free window in which to pay for the items or services. In this case, on the other hand, payment is delayed 21 days because the Agreement specifically required that the eggs be graded, and the price adjusted accordingly. The nature of the transactions required time between shipment and payment so that the appropriate price could be determined. This is fundamentally different from purchasing goods on credit; the Rexings were permitted to engage in the reconciliation process in order to determine the amount they were obligated to pay, before they could be expected to pay.

In addition, in this case, nearly all of the damages are for eggs Rembrandt continued to produce after it had knowledge the Rexings would not accept them. Though Rembrandt was surely entitled to do so under the Agreement, and the Rexings are liable for Rembrandt's corresponding damages under the UCC, it cannot be said that the Rexings purchased those goods on credit. Of the $1,522,302.61 for which the Rexings are liable under the contract, only

---

[9] Twelve loads of shell eggs—the amount of eggs the Rexings agreed to purchase weekly and were required to grade—amounts to roughly 3,240,000 eggs. [Filing No. 1-1 at 7.]

[10] The parties' course of dealing indicates that the invoices were sent along with the shipment of eggs. Then, after grading, the invoices were revised to adjust the price based on the grading. [*See* No. 73 at 38 ("Q: The amounts paid from Rexing to Rembrandt are often just slightly less than the invoices that were sent from Rembrandt to Rexing because of this issue of calculating the price of the excess losses? **A: Yes.**"); Filing No. 73 at 37 ("Q: So if we look at page 4 of Exhibit 92, the example of the revised invoice, in order to arrive at the amount of the revised invoice which gave Rexing a deduction in the case of excess losses on the shipment, Rembrandt had to do some math; is that right? **A: Yes.**").]

$60,069.61—less than 4% of the total—is for eggs the Rexings received but for which they did not pay. Such a small percentage suggests that as the eggs came in, the Rexings were obligated to pay for them, subject only to a small delay for the parties to calculate the price. The Court concludes that the Agreement did not call for a sale of goods on credit, rather it established a delayed payment mechanism due to the unique nature of the parties' agreement.

It is true that "[c]ontracting parties have wide latitude to fashion their own remedies for a breach of contract[,] and to deny full effect to such express contractual provisions is ordinarily impermissible because it would effectively reconstruct the contract contrary to the intent of the parties." *Wolfe,* 795 N.W.2d at 72 (internal quotation marks omitted). However, contracts must be drafted in accordance with the law, and Iowa law painstakingly describes the maximum lawful interest rate. Iowa Code § 535.2(3)(1). Rembrandt brought this action to recover on the Agreement—an agreement with a "Rembrandt Foods" letterhead—and the Court has determined that the interest rate contracted for in the Agreement exceeds 3.50% per year, the maximum lawful interest rate. Accordingly, Rembrandt is not entitled to attorneys' fees, prejudgment interest, or costs. Iowa Code § 535.5.

## II.
### CONCLUSION

Based on the foregoing, Rembrandt's Motion for Reasonable Attorneys' Fees, Prejudgment Interest, and Costs, [216], is **DENIED**. Final Judgment shall issue accordingly.

Date: 3/31/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**

**Distribution via U.S. Mail to:**

**Michael L. Fitzgerald**
State Treasurer's Office
Capitol Building
1007 E. Grand Ave.
Des Moines, IA 50319

**Attorney General Tom Miller**
Office of the Attorney General of Iowa
Hoover State Office Building
1305 E. Walnut St.
Des Moines, IA 50319